Jason J. GREEN, Appellant–Petitioner

v.

Laura S. GREEN, Appellee–Respondent.

No. 52A04–0508–CV–463.

Court of Appeals of Indiana.

Feb. 27, 2006.

Monty K. Woolsey, Miroff, Cross & Woolsey, Indianapolis, for Appellant.

Donald G. Fern, Fern, Grund & Grund, Peru, for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Jason Green appeals the trial court's denial of his petition to modify custody of his ten-year-old son, B.G. Jason requested a modification upon learning that his ex-wife and B.G.'s mother, Laura Green, was planning to relocate to the state of Iowa. We find that the trial court failed to make a proper assessment of B.G.'s best interests, as required under Indiana Code § 31-17-2-8, and it therefore abused its discretion when it denied Jason's petition for modification. Reversed and remanded.

### Facts and Procedural History

Jason and Laura Green were divorced in the Miami Circuit Court on February 14, 2001. They had one son, B.G., born in January 1995. The parties agreed to joint legal custody of B.G. with Laura having physical custody and Jason having parenting time upon reasonable notice and at all reasonable times and places. In accordance with the Indiana Child Support Guidelines, Jason was ordered to pay child support in the amount of $99.00 per week. Eventually, B.G. began riding the school bus home to his father's house each weekday; he typically remained with Jason until 6:00 p.m. each weekday except that he remained overnight each Wednesday, and he saw Jason every weekend, sometimes for overnight stays.[1] In total, the parties estimate that B.G. spends 150 nights each year with Jason.

In April 2002, Laura filed a notice of intent to relocate to Iowa with the Miami Circuit Court. Laura wished to move at that time in order to find better employment and to be close to her family in Iowa. Jason agreed with Laura's plan to relocate at that time because he was single and planned to move to Iowa once Laura was settled so that he could remain near B.G.[2] Laura moved to Iowa seeking employment but returned to Indiana because she was unable to find suitable employment and because she was concerned about the disruption in B.G. and Jason's relationship.

In March 2004, Jason filed a request with the trial court to increase his parenting time to reflect his daily visitation and the 150 overnights per year B.G. spent with Jason. He also requested a corresponding modification in child support. At a hearing in April 2005, Laura testified that she intended to stay in Indiana and had no intention, at that time, of moving to Iowa. Tr. p. 14–15. On April 19, 2005, over Laura's objection, the court ordered visitation pursuant to the Parenting Time Guidelines and stated that it would not disturb the current weekday visitation arrangements adopted by the parties. The court also reduced Jason's child support obligation to $36.60 per week.

Just ten days after the trial court's modification order, Laura interviewed for employment in Iowa. On May 4, 2005, Laura notified Jason that she intended to move to Iowa. On May 18, 2005, Jason filed a petition to change custody and a request for an emergency hearing prohibiting Laura from relocating out-of-state with B.G. The

---

1. The record is not entirely clear regarding the time period during which this specific visitation arrangement developed. However, Laura testified that since the divorce, Jason has maintained a daily presence in B.G.'s life and that B.G. had been going to Jason's home after school everyday for at least the year prior to the commencement of this dispute.

Tr. p. 10–11. We therefore assume that an arrangement substantially similar to this, at least with regards to the frequency of contact between father and son, has been continuously in place since the divorce.

2. Jason has since remarried and, at this time, is unwilling or unable to move to Iowa.

court scheduled a hearing and, in the interim, prohibited Laura from removing B.G. from Indiana. On May 19, 2005, Laura filed a notice of intent to relocate to Iowa, indicating her move-date would be June 4, 2005. Laura also filed a motion to set aside the court's order prohibiting her from removing B.G. from Indiana and, following a June 22, 2005, hearing, the court granted the motion to set aside and set the custody case for a final hearing for July 19, 2005.

At the final hearing, Laura testified that she had to relocate due to her financial condition because of the April 2005 order decreasing child support and because she wanted to be closer to her family living in Iowa, which includes her parents, three siblings, two nieces, and several aunts and uncles. *Id.* at 14, 16, 20, 38. She testified that she had been earning $515.00 per week in Indiana, but that she accepted a position in Iowa paying $400.00 per week and planned to live with her parents until she became financially stable. *Id.* at 10, 14, 21. She acknowledged that Jason has been a "daily presence" in B.G.'s life and that he regularly supervises B.G.'s homework, *id.* at 10, and that Jason has always been very involved in B.G.'s sporting activities, including football, soccer, basketball, and baseball, and has coached his baseball team. *Id.* at 12–13. She testified that she sometimes took B.G. to sports practices and games and that Jason took him at other times. *Id.* at 12. Additionally, she confirmed that Jason paid a portion of the costs for B.G.'s school supplies and paid for all of the supplies and fees associated with his sporting activities.

Laura further testified that her parent's home in Iowa is a six-and-one-half hour drive from Jason's home, and she recognized that this distance would preclude weekday visitations and make weekend visits difficult for Jason. *Id.* at 27. How-

ever, she did agree that she would make B.G. available to Jason via video conferencing, though she was unaware of the cost to do so or the availability of the service in her parent's area. *Id.* at 34. Laura also testified that B.G. has a close relationship with his paternal grandmother in Indiana, who provides daily care for him in the summer and with whom he visits overnight each month, and she testified that he regularly visits with several cousins near his age in Indiana. *Id.* at 19, 28. With regard to B.G.'s familiarity with Iowa and his maternal relatives, Laura testified that she and B.G. have visited the area two to three times a year, three to four days at a time, and that B.G. has two younger female cousins that would attend his same school. *Id.* at 30, 38. In addition, B.G.'s maternal grandmother and his aunt testified that they have traveled to Indiana to visit on occasion, *id.* at 94, 97, and Grandmother testified that B.G. has a very close relationship with Laura. *Id.* at 92. Laura testified that B.G. has done well in the Maconaquah school he has attended since kindergarten and that she is unfamiliar with the quality of the local school system in Iowa. *Id.* at 20. Her sister testified that her children attend the elementary school B.G. would attend in Iowa and that she is happy with the school. *Id.* at 96. Finally, Laura testified that if the trial court were to award custody of B.G. to Jason, she would remain in Iowa. *Id.* at 21.

Jason testified that he has always been a daily participant in B.G.'s life and that B.G. came to his home after school each day. *Id.* at 40–41. He testified that B.G. was required to complete his homework immediately following school and before he could participate in extracurricular activities, and Jason confirmed that he supervised B.G.'s homework. *Id.* at 41. He further testified that he and B.G. enjoy a close relationship and frequently fish, hunt, ride four-wheelers, and play sports

together. *Id.* at 40. Additionally, Jason testified that he accompanied B.G. to sports practices daily, attended all of B.G.'s games, and coached his baseball team last season, and that he paid for much of B.G.'s school supplies and all of his sporting supplies. *Id.* at 47–48. Jason claimed that Laura seldom attended any of B.G.'s sporting activities until this custody dispute began, at which time she began attending most of B.G.'s games, though not his practices. *Id.*

Jason testified that he was concerned about Laura relocating because it would prevent him from seeing B.G. and participating in school, sports, and other extracurricular activities with the boy. *Id.* at 40, 52–53. Noting B.G.'s success in the Maconaquah School District, Jason claimed to have researched the school system B.G. would be attending and found it to be "a blackballed school system that can't even meet the government standards." *Id.* at 52. He also expressed concern that Laura was not financially independent in Iowa and was living with her mother rather than in her own housing. *Id.* at 52–53. Jason testified that B.G. has many positive, established relationships in Indiana, including close relationships with both Jason and Jason's mother, a good relationship with Jason's stepson—who is B.G.'s age and who attends B.G.'s school and plays on several sporting teams with B.G.—good relationships with three cousins who live nearby, and numerous established friendships at school, on his sports teams, and with several children in Jason's neighborhood. *Id.* at 48–49, 56. He also testified that, in contrast to his relationships in Indiana, B.G. has had only very limited contact with his family in Iowa. *Id.* at 53. Jason testified that he has held the same job for eight years, that he and his wife have lived for three years in their current home, which they are buying, and that he is in a good position to assume full custody of B.G. *Id.* at 39–41, 49.

Jason's current wife, Cynthia Green, testified that Jason and B.G. have a close relationship with daily contact and that B.G. is close with her son and has a good relationship with her. *Id.* at 67–68. She also testified that she once witnessed B.G. as he scratched out the state of Iowa on a map with a pen. *Id.* at 69. Additionally, Jason's mother, Gloria Green, testified that she has a close relationship with her grandson; she reports that she has seen him almost daily since his birth and that she attends a majority of his sporting events. *Id.* at 72, 77–78.

On July 20, 2005, the court entered an order denying Jason's petition to modify custody and again modified his child support obligation, increasing it to $82.00 per week. Jason now appeals to this Court, seeking custody of his son.

### Discussion and Decision

Jason presents several issues for our review, which we consolidate and rephrase as whether the trial court abused its discretion by denying his petition to modify custody. In general, we review custody modifications for an abuse of discretion, with a "preference for granting latitude and deference to our trial judges in family law matters." *Apter v. Ross,* 781 N.E.2d 744, 757 (Ind.Ct.App.2003) (quoting *Kirk v. Kirk,* 770 N.E.2d 304, 307 (Ind. 2002)), *trans. denied.* When reviewing a trial court's determination to modify custody, we may not reweigh the evidence or judge the credibility of the witnesses. *Leisure v. Wheeler,* 828 N.E.2d 409, 414 (Ind.Ct.App.2005). Rather, we consider only the evidence most favorable to the judgment and any reasonable inferences from that evidence. *Id.*

In the initial custody determination, both parents are presumed equally

entitled to custody, but a petitioner seeking subsequent modification bears the burden of demonstrating that the existing custody arrangement should be altered. *Id.* A court may not modify a child custody order unless (1) the modification is in the best interests of the child and (2) there is a substantial change in one or more of the factors a court may consider under Indiana Code § 31–17–2–8 when it originally determines custody. *See* Ind.Code § 31–17–2–21. Section 8 provides:

> The court shall determine custody and enter a custody order in accordance with the best interests of the child. In determining the best interests of the child, there is no presumption favoring either parent. The court shall consider all relevant factors, including the following:
>
> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
>> (A) the child's parent or parents;
>>
>> (B) the child's sibling; and
>>
>> (C) any other person who may significantly affect the child's best interests.
>
> (5) The child's adjustment to the child's:
>
>> (A) home;
>>
>> (B) school; and
>>
>> (C) community.
>
> (6) The mental and physical health of all individuals involved.
>
> (7) Evidence of a pattern of domestic or family violence by either parent.
>
> (8) Evidence that the child has been cared for by a de facto custodian

> . . . .

Ind.Code § 31–17–2–8. A custodial parent's relocation, alone, will not support a modification of custody; rather, it is the effect of the move upon the child that renders a relocation substantial or inconsequential—i.e., against or in line with the child's best interests—when determining whether to change custody. *Lamb v. Wenning,* 600 N.E.2d 96, 99 (Ind.1992).

■ As the trial court did not issue findings in the proceeding below, we cannot be certain as to which of the section 8 factors the trial court considered important or as to the manner, if at all, in which each factor was evaluated. We do note that footnote one of the trial court's order seems to address this matter cursorily, stating:

> The Court is aware of the close, loving and supportive relationship that Petitioner has with the minor child. However, in addition to the minor child experiencing new opportunities with other family members, schoolmates and friends, the Court anticipates the Petitioner and his family will not miss an opportunity to visit with the minor child as well.

Appellant's Br. p. 29. Our reading of this footnote indicates that, at the least, the trial court considered B.G.'s relationship with Jason, which corresponds to Factor 4(A) under section 8: the relationship of the child with his parents. While we agree with the trial court's assessment that Jason and B.G. enjoy a close, loving, and supportive relationship, we are convinced that a proper evaluation of this custody dispute must take into account several other section 8 factors. For that reason, we must remand to the trial court for an evaluation of the evidence that fully considers those factors in determining wheth-

er modification is in the best interests of this child.[3]

In particular, the trial court appears not to have considered several factors that, taken together, suggest that relocation to Iowa may not be in B.G.'s best interests. First, Factor 4(B) requires that the court consider the relationship between a child and his siblings. While, of course, B.G.'s step-brother is not his biological sibling, various parties testified that the boys, both age ten, share a close friendship, that they are in the same class at school, and that they play on several of the same sports teams. Additionally, because of B.G.'s regular visitation with his father, the boys spend time together on an almost-daily basis. A proper analysis of B.G.'s best interests, then, should take this relationship into account.

Next, and we think even more importantly, are the considerations called for under Factor 4(C), which requires the court to consider the child's relationships with other persons who may significantly affect his best interests. Both parties to this action testified as to the closeness of B.G.'s relationship with his paternal grandmother, Gloria Green. Gloria has been an almost-daily presence in B.G.'s life since his birth; she has watched him when his parents worked, kept him daily during the summers since his parents' divorce, regularly attended his sporting events, and kept him overnight on many occasions. The significance of this sort of relationship to a boy should not be regarded lightly.

Also, as an aside, we note that B.G. has a good relationship with his stepmother, Cynthia Green. While we do not find the record to suggest that the loss of this relationship would be particularly negative to B.G., we note that its positive nature supports the idea that B.G. would do well living with his father's family.

Finally, Factor 5 takes into account the child's adjustment to his home (Factor 5(A)), school (Factor 5(B)), and community (Factor 5(C)). B.G. is used to daily visits to Jason's home, while he conversely is unaccustomed to time spent at his maternal grandmother's home in Iowa. The parties agree, further, that B.G.'s adjustment to his school is evidenced by his good grades, by the fact that he has never attended any other schools, and by Jason and Laura's satisfaction with the Maconaquah School District. No clear evidence was presented to clarify whether the Iowa school system B.G. would attend was actually an inferior school system, but without considering this argument we still take notice that B.G. has adjusted well to the Maconaquah schools. Moreover, B.G.'s adjustment to his community is evidenced by his strong involvement in community sports and recreation programs and by the many friends the child has among his cousins, schoolmates, teammates, and neighbors. The testimony presented indicates that B.G. is an active child in the community and that he has a strong and established network of support therein. A proper de-

3. Although Jason does not argue that the trial court should have prohibited Laura from relocating with B.G. because she did so in bad faith retaliation against Jason's successful petition to modify child support, we are mindful that the timing of her move—after having testified that she had no plan or intention to relocate—is questionable. Indiana courts have found that it is proper to consider a custodial parent's motivation when evaluating the propriety of a relocation that separates a child from a non-custodial parent. *See, e.g., Swonder v. Swonder,* 642 N.E.2d 1376, 1380 (Ind.Ct.App.1994) ("The denial of continued custody, solely on the grounds of change in residence, is improper 'where the move is being made in good faith and out of a desire to improve the material or psychological life of the custodian, so long as the child's interests are not prejudiced thereby.' ") (citing *Sebastian v. Sebastian,* 524 N.E.2d 29, 33 (Ind. Ct.App.1988)).

termination of B.G.'s best interests certainly should address these considerations.

Proper evaluation, then, of each of the section 8 factors relevant to this particular determination strongly suggests that B.G.'s best interests may better be served through a custody modification allowing him to remain in Indiana with his father. At the very least, the trial court has a statutory duty to weigh all of these factors in arriving at its determination. We are reminded of our Supreme Court's framing of this issue in *Lamb v. Wenning:*

> [W]here a very young child or baby is involved, a move out of state may have little or no effect on the child. For an older child who has formed friendships, attends school, and participates in activities or sports, is involved in church, or enjoys the security of supportive relationships with nearby relatives or others in his community, a move out of state may have a much more significant effect. Whether the effect is of such a nature as to require a change in custody is a matter within the sound discretion of the trial court.

600 N.E.2d at 99. By ignoring relevant section 8 factors, we hold that the trial court abused its discretion when it denied Jason's petition to modify custody. We therefore reverse and remand to the trial court for a determination regarding whether the effect of Laura's relocation to Iowa is of such a nature as to require a modification in the custody of B.G.

Reversed and remanded.

ROBB, J., and MATHIAS, J, concur.