**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**KATHERINE J. NOEL**
Noel Law
Kokomo, Indiana

ATTORNEY FOR APPELLEE:

**RICHARD D. MARTIN**
Frankfort, Indiana

FILED

Mar 20 2012, 9:24 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| B.M. (Mother), | ) |
| | ) |
| Appellant-Respondent, | ) |
| | ) |
| vs. | ) No. 12A02-1107-JP-722 |
| | ) |
| M.M (Father) and M.R.M. (Minor Child), | ) |
| b/n/f M.M., | ) |
| | ) |
| Appellees-Petitioners. | ) |

APPEAL FROM THE CLINTON JUVENILE COURT
The Honorable Donald E. Currie, Special Judge
Cause No. 12C01-0809-JP-209

**March 20, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

B.M. (Mother) appeals the trial court's order awarding physical custody of her daughter, M.R.M., to the child's father, M.M. (Father). Specifically, Mother argues that the trial court erred by failing to enter specific findings of fact and conclusions of law in support of its judgment. Additionally, Mother argues that the trial court applied the wrong standard in awarding physical custody to Father.

Father cross-appeals, contending that he is entitled to appellate attorney fees because Mother's arguments are implausible and her statement of facts was deficient. More particularly, Father claims that Mother failed to present those facts most favorable to the trial court's judgment, thereby requiring Father to expend additional time preparing an appropriate statement of facts. Finding no error and concluding that Father is not entitled to appellate attorney fees, we affirm the decision of the trial court.

## FACTS

Mother and Father met in October 2001. M.R.M. was born on September 22, 2002. Upon the child's birth, Father moved in with Mother and her parents. Mother, Father, and M.R.M. continued to live with Mother's parents for approximately three and one-half years. Thereafter, for the next eighteen months or so, Mother and Father continued to live together and share responsibilities for M.R.M.'s care.

Mother and Father initially broke up in 2006, at which time she and M.R.M. moved back into Mother's parents' residence. Thereafter, sometime in 2007, Mother and Father tried, unsuccessfully, to reconcile.

After the 2006 break-up, Father was permitted parenting time "[w]hen allowed." Tr. p. 47. During one period, Father watched M.R.M. every day while Mother worked.

After the break-up, Mother became involved in a series of relationships with several men, many of whom resided with her and M.R.M. at her parents' residence. Approximately six months after the initial break-up, Mother took M.R.M. and moved to Indianapolis with "Phil," without telling Father or providing him with an address or telephone number. Thereafter, Mother, Phil, and M.R.M. returned to Mother's parents' residence in Frankfort. In the interim, Father's only contact with M.R.M. was "when she would call me." Tr. p. 44. Almost immediately after moving into Mother's parents' residence, Phil moved out.

Sometime thereafter, another man with whom Mother was having a relationship moved in with Mother and her family. In fact, Father testified – in response to a preliminary question by Mother's counsel – that this man "threatened to kill their whole entire family because of an [X]box." Id. at 45.

Thereafter, Mother and M.R.M. resided in Frankfort with "Craig." During the time when they resided with Craig, Father had parenting time with M.R.M. nearly every day "[w]hen I was allowed." Id. at 46. After Craig left, a man named "Brian" moved in with M.R.M., Mother, and her parents.

On September 24, 2008, Father and M.R.M. filed their petition to establish paternity because Father was being denied parenting time with M.R.M. On October 16, 2008, Father filed an emergency motion to establish parenting time, whereupon an

3

agreement was reached allowing Father to have parenting time with M.R.M. pursuant to the Indiana Parenting Time Guidelines "pending final hearing." Appellant's App. p. 17.

On January 6, 2010, Mother filed a notice of intent to move residence, indicating her intent to move on or about April 4, 2010 to Texas. On April 22, 2010, Father filed a motion for temporary and permanent order to prevent relocation of the child and a request for ruling on a motion for the appointment of a Guardian Ad Litem (GAL). On August 18, 2010, the parties reached an agreement which included appointing a GAL and directing the GAL to report to the court and the attorneys at least ten days before the final hearing.

On October 15, 2010, the report of the Guardian Ad Litem (GAL) was filed. In his report, the GAL engaged in a detailed analysis of the custody factors outlined in Indiana Code sections 31-17-2-8 and 31-14-13-2, explaining whether, in his opinion, each factor favored either parent. In addition, the GAL addressed the factors outlined in Indiana's relocation statutes, Indiana Code sections 31-17-2.2-1 and 31-14-13-10. Based upon his analysis, the GAL indicated:

> the GAL believes that the move is not supported by the evidence or in [M.R.M.]'s best interest. The GAL believes the move fails 4 of the 5 factors to consider – the move involves great distance; the move creates a hardship for [Father]; the move makes the current parenting schedule impossible; and the move is for the reason of following [Mother]'s new husband. The GAL recommends that the Court deny [Mother]'s request to move to Texas with [M.R.M].

Appellant's App. p. 80-81.

4

The GAL's report then addressed the issue of primary custody, concluding that the parties should share joint legal custody of M.R.M. Furthermore, the GAL determined that Father was the more stable and appropriate choice for primary physical custody.

At the final hearing on April 18, 2011, the GAL testified that it was not in M.R.M.'s best interest to relocate to Texas. In the GAL's opinion, Father was more stable, while he had "some concerns with some of the decisions and [the] relationship that [Mother] was in, and how that affected stability in the home life." Tr. p. 10. Additionally, the GAL testified that, notwithstanding the relocation and even if Mother was to stay in Indiana, he believed Father was the more stable parent and would still recommend that he be the primary physical custodian. Likewise, the GAL testified that, regardless of whether this matter is viewed as an initial determination of custody or a modification of custody, his recommendation would be that Father be awarded primary physical custody.

A substantial portion of the GAL's report, testimony, and evidence was related to Mother's online communications with an individual known as Darryl Johnson or "Deezy." Tr. p. 103. Deezy was a fabricated person created by J.B., Father's wife and M.R.M.'s stepmother (Stepmother). Stepmother testified that she created Deezy's profile on MySpace, a social networking site, "because [Mother's] history with men has always been young black men, so I just created a young black man that I thought would appeal to her." Id.

5

When Stepmother, as Deezy, sent Mother a friend request through MySpace, she accepted immediately and sent Deezy a message. Over the next several months, Mother maintained a regular dialogue with Deezy through instant messaging and emails. Several of these communications were furnished to the GAL and admitted into evidence.

In Mother's online communications with Deezy, she informed him that she is "gettin married on April 3rd [2010]," noting "I have a court hearing on the 21st . . . baby's daddy is tryna keep me from goin to Texas, but I figure if I'm married there ain't sh*t they can do about it , u know." Pet. Ex. 8 p. 1. Additionally, Mother indicated that "I see this whole marriage thing goin' no where fast" and that all her husband does is drink and play video games. Id. at 2. Mother reported that her husband tossed her "around like[a] rag doll n treated [her] like a Red Headed Step-Child . . . slammed [her] against the wall . . . all kinds of sh*t!!" and she "jacked em in his jaw." Id. at 3. Mother described other incidents of physical abuse and stated that she believed that her husband cheated on her.

In another set of communications, Mother promised to send Deezy some pictures of herself. As promised, Mother emailed Deezy several digital photos, including semi-nude photos taken in front of a mirror. In addition, she indicated that she is on "Lortabs," "[X]anax," and "muscle relaxers" "just to be able to handle da sh*t." Pet. Ex. 14.

The GAL testified that Mother appeared shocked when he informed her that Deezy was actually Stepmother. The GAL also stated that Mother had told him that she

6

thought that Father had hacked into her system, but the GAL did not "recall her saying ever she knew that this fictional person, Dizzy (sic), was a fictional person." Tr. p. 24.

On direct examination, however, Mother testified that at some point, she doubted that she was actually communicating with Deezy. Indeed, Mother testified that she and her husband began sending "fictitious emails . . . to give [Father and Stepmother] something to talk about." Tr. p. 145. Mother also testified that she believed that someone had hacked into a folder on her email account containing the photographs that she had sent to her husband "[w]hile he was in Texas." Id. at 154. After some inquiring by the trial court, Mother claimed that both her Yahoo and MySpace accounts had been hacked.

On June 24, 2011, the trial court issued an order denying Mother's request to relocate to Texas and awarding joint legal custody of M.R.M., with Father having primary physical custody subject to Mother's parenting time pursuant to the Indiana Parenting Time Guidelines. Mother was ordered to pay weekly child support in the amount of $33, but gave Mother a credit in the amount of Father's $809 child support delinquency. Mother now appeals.

DISCUSSION AND DECISION

I. Findings of Fact and Conclusions of Law

Mother maintains that the trial court erred by failing to include findings of fact and conclusions of law in support of its order. Trial Rule 52(A) provides, in relevant part:

7

> In the case of issues tried upon the facts without a jury or with an advisory jury, the court shall determine the facts and judgment shall be entered thereon pursuant to Rule 58. Upon its own motion, or the written request of any party filed with the court prior to the admission of evidence, the court in all actions tried upon the facts or with an advisory jury . . . shall find the facts specifically and state its conclusions thereon. . . .

Additionally, Rule 52(A) requires that a trial court enter special findings "in any other case provided by these rules or by statute."

Initially, we note that neither party requested that the trial court make special findings of fact. Regarding statutory authority, Indiana Code section 31-17-2-8 (Section 8) pertains to custody orders and states that "[t]he court shall determine custody and enter a custody order in accordance with the best interests of the child. In determining the best interests of the child, there is no presumption favoring either parent. The court shall consider all relevant factors . . . ." Section 8 then lists the factors that the trial court must consider.

While the trial court must consider the Section 8 factors and enter a custody order in accordance with the best interest of the child, the statute does not require that the trial court enter special findings of fact. Furthermore, as stated above, neither party requested that the trial court enter special findings of fact in this case. Accordingly, the trial court did err by not entering special findings of fact.

Nevertheless, Mother contends that Green v. Green, 843 N.E.2d 23 (Ind. Ct. App. 2006), dictates a different result. In Green, the father filed a request for a modification of child support in March 2004 to reflect his frequent parenting time with his son, which

8

included daily visits and 150 overnights per year. Id. at 24. At the time of the April 2005 hearing, the mother testified that she intended to stay in Indiana. Id. The trial court reduced the father's child support obligation from $99 per week to $36.60 per week. Id.

Just ten days after the modification order, the mother interviewed for a job in Iowa. Id. On May 4, 2005, the mother notified the father that she intended to move to Iowa, and the father filed a petition to change custody and requested an emergency hearing prohibiting the mother from relocating to Iowa with their son. Id.

The mother testified that she had to relocate because the April 2005 order decreasing her child support had harmed her financially and because she wanted to be closer to her family. Id. at 25. She testified that although she was giving up her job in Indiana earning $515 weekly for a job in Iowa earning $400 weekly, she would be living with her parents until she was financially stable. Id.

The mother also acknowledged that the father had been a daily presence in their son's life and that he regularly supervised his homework and had been very involved in his sporting activities, including coaching his baseball team. Id. By contrast, the father claimed that the mother rarely attended any of the son's sporting events until the custody dispute began and still failed to attend his practices. Id. at 26.

The father further testified that the son had a great relationship with the father's new stepson, who was the same age. Id. The father also noted the son's academic success and expressed concern regarding the school he would be attending in Iowa. Id.

9

Finally, the father testified to the close relationship that his son had with his family, including his paternal grandmother. Id.

In July 2005, the trial court entered an order denying the father's petition to modify custody and raised his support obligation to $82 a week. Id. The father appealed to this Court. Id.

As highlighted by Mother in the instant case, the Green panel stated, "[a]s the trial court did not issue findings in the proceeding below, we cannot be certain as to which of the section 8 factors the trial court considered important or as to the manner, if at all, in which each factor was evaluated." Id. at 27. However, the panel also stated "[p]roper evaluation, then, of each of the section 8 factors relevant to this particular determination strongly suggests that B.G.'s best interests may better be served through a custody modification allowing him to remain in Indiana with his father." Id. at 29.

This language indicates that the Green panel was perplexed by the trial court's determination in light of the evidence presented at the final hearing and by the timing of the mother's petition to relocate so soon after the father was granted a child support modification. See id. at 28 fn.3 (noting that "we are mindful that the timing of her move – after having testified that she had no plan or intention to relocate – is questionable"). And in light of our general preference of showing deference to our trial judges in family law matters, the Green panel reversed and remanded so that the trial court could properly consider Section 8 factors and explain its decision. Put another way, the holding in Green must be viewed within the context of the particular facts of that case. Moreover,

10

the panel did not say that special findings are required whenever child custody is at issue. See also Palm v. Palm, 690 N.E.2d 364, 367-68 (Ind. Ct. App. 1998) (concluding that the trial court did not err by failing to enter special findings of fact or conclusions of law where request under Rule 52(A) was untimely and although the statute "mandates the court to consider if it is in the best interest of the child that another state assume jurisdiction and sets forth a nonexclusive list of factors . . . there is nothing in the statute which required the trial court to enter special findings and conclusions"). Consequently, this argument fails.

## II. Custody

Mother maintains that the trial court abused its discretion when it awarded primary physical custody of M.R.M. to Father. As a general matter, a trial court's custody decision is reviewed for an abuse of discretion. Russell v. Russell, 682 N.E.2d 513, 515 (Ind. 1997). Moreover, where special findings are neither requested nor entered, the trial court's general judgment will be sustained on any theory which is supported by the evidence. In re The Marriage of Julie C. & Andrew C., 924 N.E.2d 1249, 1255 (Ind. Ct. App. 2010).

Initially, we note that Mother contends that the trial court applied the wrong standard. More particularly, Mother asserts that the more stringent standard for custody modifications should have applied instead of the standard for initial custody determinations.

11

The appropriate legal standard in the instant case was determined when Mother filed her notice of intent to move residence on January 6, 2010. The trial court then had to rule on Father's motion to prevent relocation in addition to his motion to establish paternity in which he requested that he be granted primary physical custody of M.R.M. Nevertheless, from that point forward, the relocation statutes[1] became the appropriate legal standard.

Under the relocation statutes, "'[t]he relocating individual has the burden of proof that the proposed relocation is made in good faith and for a legitimate reason.'" T.L. v. J.L., 950 N.E.2d 779, 784 (Ind. Ct. App. 2011) (quoting Ind. Code § 31-17-2.2-5(c)). If the relocating parent satisfies this burden, "'the burden shifts to the nonrelocating parent to show that the proposed relocation is not in the best interest of the child.'" Id. (quoting I.C. § 31-17-2.2-5(d)).

In considering the proposed relocation, the trial court shall take into account the following factors:

(1) The distance involved in the proposed change of residence.

(2) The hardship and expense involved for the nonrelocating individual to exercise parenting time or grandparent visitation.

(3) The feasibility of preserving the relationship between the nonrelocating individual and the child through suitable parenting time and grandparent visitation arrangements, including consideration of the financial circumstances of the parties.

---

[1] Ind. Code § 31-17-2.2 et seq.

12

(4) Whether there is an established pattern of conduct by the relocating individual, including actions by the relocating individual to either promote or thwart a nonrelocating individual's contact with the child.

(5) The reasons provided by the:

(A) relocating individual for seeking relocation; and

(B) nonrelocating parent for opposing the relocation of the child.

(6) Other factors affecting the best interest of the child.

I.C. § 31-17-2.2-1(b).

Our Supreme Court has instructed that by implication, the factors set forth for custody determinations and modifications under Section 8 require consideration when determining what other factors may affect the best interest of the child. Baxendale v. Raich, 878 N.E.2d 1252, 1257 (Ind. 2008). Section 8 factors include the age and sex of the child; the parent's wishes; the child's wishes, with more consideration given to the child's wishes if the child is at least fourteen years old; the relationship that the child has with his or her parents, siblings, and any other person affecting the child's best interests; the child's adjustment to home, school, and the community; the health of all individuals involved; evidence of a pattern of domestic violence; and evidence that the child has been cared for by a de facto custodian. I.C. § 31-17-2-8.

Here, as discussed above, in Mother's online communications with the fictitious Deezy, she informed him that she was "gettin married on April 3rd [2010]," and that she had "a court hearing on the 21st . . . baby's daddy is tryna keep me from goin to Texas, but I figure if I'm married there ain't sh*t they can do about it, u know." Pet. Ex. 8 p. 1.

13

Mother indicates that she sees "this whole marriage thing goin' no where fast." Id. at 2. Mother confided in Deezy that all her husband does is drink alcohol and play video games and, at times, becomes violent. She described an incident where he tossed her "around like [a] rag dog n treated [her] like a Red Headed Step-Child . . . slammed [her] against the wall . . . all kinds of sh*t!!" Id. at 3. Mother also stated that she is on "Lortabs," "[X]anax," and "muscle relaxers" "just to be able to handle da sh*t." Pet. Ex. 14.

Mother's online communications with Deezy were not limited to written exchanges. More particularly, Mother sent Deezy semi-nude photographs of herself. Pet. Ex. 9-10.

After Mother and Father broke up in 2006, Father was permitted to exercise parenting time "[w]hen [he] was allowed." Tr. p. 46. At times, Mother would permit Father to see M.R.M. every day, but at other times, Mother would deny him parenting time until Father filed an emergency motion to establish parenting time. Id. at 46-47.

Mother was also involved in a series of relationships with men, many of whom resided with her and M.R.M. Most notably, approximately six months after Mother and Father ended their relationship, Mother took M.R.M. and moved to Indianapolis with a man named "Phil" without telling Father or providing him with an address or telephone number. Tr. p. 44. Sometime thereafter, another man with whom Mother was having a relationship moved in with Mother and M.R.M. and at one point "threatened to kill their whole entire family because of an [X]box." Id. at 45.

14

The GAL summarized his report by concluding that in light of the above facts, he was "greatly concerned for Mother and M.R.M.'s safety" with Mother's husband "and for [Mother]'s decision-making." Pet. Ex. 1 p. 15. By contrast, the GAL noted that Father and Stepmother appeared "to be more stable financially" and "own[ed] their own residence." Id. at 16. Likewise, the GAL concluded that Father is "the more stable parent and more appropriate choice for primary custody" and that "[w]hile [M.R.M.] has always lived with her mother and has a very close relationship with her, the GAL has some serious concerns about [Mother]'s decision-making and future plans." Id.

Under these facts and circumstances, we cannot say that the trial court erred by denying Mother's request to relocate to Texas with M.R.M. and awarding primary physical custody to Father. The distance between Indiana and Texas would certainly create a hardship on Father in exercising his parenting time with M.R.M. Perhaps most compelling, Mother's proposed move to Texas is to follow her husband, who, by her own account, is abusive and the marriage is unstable. Moreover, in light of the evidence discussed above, we cannot say the trial court erred by awarding primary physical custody of M.R.M. to Father, inasmuch as there was evidence that Mother lacked adequate decisionmaking skills and stability in her life. Consequently, this argument fails.

### III. Appellate Attorney Fees

Father argues that pursuant to Appellate Rule 66(E), he is entitled to appellate attorney fees for Mother's substantive and procedural bad faith claims. The discretion to

award attorney fees under Rule 66(E) is limited to instances "when an appeal is permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay." Thacker v. Wentzel, 797 N.E.2d 342, 346 (Ind. Ct. App. 2003). Moreover, while Rule 66(E) provides us with discretionary authority to award attorney fees on appeal, "we must use extreme restraint when exercising this power because of the potential chilling effect upon the exercise of the right to appeal." Id.

We have categorized claims for appellate attorney fees into "substantive" and "procedural" bad faith claims. Id. A substantive bad faith claim is one that is utterly devoid of all plausibility. Id. By contrast, a procedural bad faith claim occurs when a party flagrantly disregards the requirements of the appellate rules, omits and misstates relevant facts appearing in the record, and files briefs written in a manner calculated to require the maximum expenditure of time both by the opposing party and the reviewing court. Id. at 346-47.

Father asserts that an award of appellate attorney fees is appropriate because of Mother's substantive and procedural bad faith. As for substantive bad faith, Father contends that Mother's argument that the trial court erred by failing to enter special findings and that it failed to apply the appropriate standard "are utterly devoid of all plausibility." Appellee's Br. p. 32.

As discussed above, the Green Court stated that "[a]s the trial court did not issue findings in the proceeding below, we cannot be certain as to which of the section 8 factors the trial court considered important or as to the manner, if at all, in which each

16

factor was evaluated." Green, 843 N.E.2d at 27. Although we think that Mother took this statement out of context and failed to view it in light of the particular facts of that case, we cannot agree that her argument, supported by Green, that the trial court should have entered findings was devoid of all plausibility.

Likewise, regarding Mother's argument that the trial court failed to apply the appropriate standard because it did not specifically state which standard it had applied, we note that the GAL stated in the summary of his report that "the Court [should] determine whether this is an initial custody determination or a modification of custody and proceed accordingly." Pet. Ex. 1 p. 16. Accordingly, we cannot agree that this argument was devoid of all plausibility.

By contrast, Father's arguments that Mother engaged in procedural bad faith are more problematic for Mother. More particularly, Appellate Rule 46(A)(6)(b) provides that the "facts shall be stated in accordance with the standard of review appropriate to the judgment or order being appealed." The applicable standard of review was that this Court only considers that evidence most favorable to the judgment, together with reasonable inferences to be drawn therefrom. Green, 843 N.E.2d at 26.

Mother's Statement of Facts is fairly argumentative and fails to provide this Court with the facts most favorable to the trial court's judgment. Indeed, a substantial portion of Mother's Statement of Facts consists of her own testimony that the trial court chose not to believe. However, while we caution parties from ignoring the Appellate Rules, Mother's failure to properly follow them was not sufficiently egregious to award Father

17

his appellate attorney fees.  Consequently, we deny Father's request for appellate attorney fees and affirm the decision of the trial court.

The judgment of the trial court is affirmed.

DARDEN, J., and BAILEY, J., concur.