## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Sep 25 2015, 8:41 am
Kevin S. Smith
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Scott C. Quick
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Denise F. Hayden
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Angel Schoettle,

*Appellant-Respondent,*

v.

Chad Schoettle,

*Appellee-Petitioner.*

September 25, 2015

Court of Appeals Case No.
49A04-1501-DR-40

Appeal from the Marion Superior Court

Trial Court Cause No.
49D03-1308-DR-30265

The Honorable Patrick J. McCarty, Judge

**Pyle, Judge.**

## Statement of the Case

[1] Appellant/Respondent, Angel Schoettle ("Mother"), appeals the trial court's award of primary physical and sole legal custody of her minor daughters, H.S. and A.S., to Appellee/Petitioner, Chad Schoettle ("Father"), pursuant to the trial court's order dissolving their marriage. On appeal, she argues that the trial court

abused its discretion by awarding Father primary physical and sole legal custody. Her argument has three components: that the trial court abused its discretion by (1) failing to enter findings of fact and conclusions supporting its award of custody to Father; (2) determining that it would be in the children's best interests for Father to have custody; and (3) awarding Father sole legal custody as opposed to joint custody. Because we conclude that the trial court was not required to enter findings of fact and conclusions of law and because there was evidence to support the trial court's determination of the best interests of the children and to support its award of sole legal custody, we affirm.

[2] We affirm.

## Issue

Whether the trial court abused its discretion by awarding Father primary physical and sole legal custody.

## Facts[1]

[3] Mother and Father (collectively, "the parents") met in April of 2008 and married in May of 2008. They had two daughters together, H.S. who was born in January of 2009 and A.S. who was born in August of 2011. Mother also had another

---

[1] We note that the "Statement of Facts" in Mother's brief is argumentative. We remind Mother's counsel that the statement of facts section of an appellant's brief shall "describe the facts relevant to the issues presented for review" but shall not contain subjective argument. Ind. Appellate Rule 46(A)(6); *see also J.C. v. Ind. Dep't of Child Services*, 3 N.E.3d 980, 981 n.1 (Ind. Ct. App. 2013).

daughter from a prior marriage, E.M., who was born in 2001 and resided with the parents for a portion of their marriage.

[4] In April or May 2013, Mother left the parents' residence and began a relationship with Scott Bodenhamer ("Bodenhamer"). That July, she and her three daughters moved in with Bodenhamer. On August 8, 2013, Father filed a petition for the dissolution of their marriage. He also filed a petition requesting preliminary relief in which he requested custody of H.S. and A.S, who were then four years old and turning two years old, respectively. In response, Mother filed a motion for an ex parte protective order against Father on behalf of herself and the children, and she then refused him parenting time for five weeks. During that time, Mother and Father exchanged the following text messages:

> [Father:] Can I talk to my girls?
>
> [Mother:] Are you suing for custody?
>
> [Mother:] Sad she has to miss her party. Oh well.
>
> [Mother:] Shame you have to take my kids. They would like to talk to you.
>
> [Father:] I would like to have the girls this weekend, so she doesn't have to miss her party. And, they can call me anytime they want to talk to me.
>
> [Mother:] Call off your custody battle. Then[,] [you are] fine.
>
> *   *   *
>
> [Father:] Who is watching the girls while u r working this weekend? Since [you are] not allowing me to have them.
>
> [Mother:] Their grandparents and Becca.
>
> [Mother:] Drop the stupid case and you can have them.

(Petitioner's Ex. 3 at 5-7) (grammar in original). Mother later stated that she had denied Father parenting time during this period due to his "threatening demeanor at parenting time exchanges." (Tr. 10).

[5] On September 11, 2013, the trial court conducted a provisional hearing on both the protective order and the petition for dissolution. At the hearing, the parents entered into an agreed entry dismissing the protective order and establishing that the parents would have temporary joint legal custody, and Mother would have temporary primary physical custody, subject to Father's parenting time. The trial court also referred the parents to the Domestic Relations Counseling Bureau ("DRCB") for evaluation of Father's custody request.

[6] An evaluator with the DRCB, Dwana Heiney ("Heiney"), attempted to evaluate the parents in November 2013. She interviewed them on November 8, 2013, but submitted a report two days later concluding that she was unable to provide a recommendation because Mother had not been compliant with the evaluation process. Specifically, Mother had failed to submit a required autobiography; refused to pay her assessment fee; refused to complete the Minnesota Multi-Phasic Inventory II ("MMPI-2"), which is a test that examines a person's emotional and psychological makeup; and failed to bring the children and Bodenhamer, who was

living with her at the time, to be interviewed. Based on the evaluation, Heiney referred the parents to receive co-parenting classes.[2]

[7] On February 5, 2014, Father filed a petition for contempt, alleging that Mother had not complied with the DRCB. The trial court conducted a hearing on the petition on February 21, 2014, and ordered Mother to cooperate. As a result, Mother and Father again met with a DRCB evaluator. The second evaluator, Diane Elliott ("Elliott"), interviewed Mother, Father, and paternal grandmother and received and read letters from maternal grandmother and other individuals who knew Mother. She also administered the MMPI-2 to both of the parents. Mother's MMPI-2 results indicated that she might "display verbal and physical aggressions at times and may use aggression in an attempt to dominate and control others, and may enjoy intimidating others." (Tr. 11). Father's MMPI-2 did not indicate that he had a problem with anger or aggression, but it did indicate that he might have difficulty recognizing when he has negative emotions.

[8] Mother's friend, Donnie Davidson ("Davidson"), wrote to the DRCB on Mother's behalf and alleged that he had seen Father drinking and driving with the children in the car. Elliott asked Father about his use of alcohol, but he denied drinking and driving. The DRCB also performed a criminal history check to see if he had a

---

[2] Another evaluator with the DRCB later explained that co-parenting classes are intended "to assist the mother and father in learning how to better communicate with each other, take any kind of anger or emotional component out of that, and essentially form a business-like relationship to co-parent their children." (Tr. 14).

history of drinking and driving, but he did not. The DRCB did not find any evidence to substantiate Davidson's allegations.

[9] In May 2014, Father's mother ("Paternal Grandmother") filed a report with child protective services ("CPS") alleging that Mother's daughter from her previous marriage, E.M., had sexually molested H.S. Neither Father nor Paternal Grandmother discussed the matter with Mother before Paternal Grandmother filed the report. Ultimately, CPS found that the allegations were unsubstantiated after it conducted an investigation. However, for the month following the report, Mother refused to speak with Father on the phone and would only interact with him through e-mail on a "need-to-know basis." (Tr. 38).

[10] On June 25, 2014, Elliott submitted her DRCB report, which was based on her interviews and evaluations. In the report, she concluded that a joint custody arrangement was not feasible due to the parents' inability to co-parent. She recommended that Father have custody because it "appeared that he would be more likely to support the other parent's relationship . . . with the child[ren], appeared to offer the child[ren] a stable home environment, and to provide the children with appropriate basic care." (Tr. 16). She later testified that she had gotten the impression that when it came to joint legal custody issues, Mother disregarded Father and wanted to make unilateral decisions.

[11] Another issue that Elliott discussed in her report was Mother's actions regarding H.S.'s schooling. Father enrolled H.S. in first grade at St. Mark Catholic School ("St. Mark") in August 2013, and he paid a deposit to the school. He also attended

a meeting with other school parents and the principal before school started. However, he later discovered that Mother had moved to the Northwest side of Indianapolis, taken H.S. out of St. Mark, and enrolled her a week late at Cardinal Elementary School ("Cardinal") in Brownsburg without consulting him. On her application for Cardinal, Mother had listed Bodenhamer as H.S.'s stepfather, even though she was not married to him.

[12] Shortly after H.S. began classes at Cardinal, the school told Mother that it would have to request that H.S. leave the school because she had not received her required immunizations. As a result, Mother took H.S. to be vaccinated. However, Cardinal still asked H.S. to leave because it discovered that Mother did not live in the Brownsburg school system and had used a false address to enroll H.S. there.

[13] Subsequently, Father talked to Mother, and Mother agreed to enroll H.S. in St. Malachy Parish School ("St. Malachy"), a Catholic school, because it was important to Father that H.S. receive a Catholic education. Mother agreed but did not list Father on the application when she enrolled H.S. at St. Malachy. Then, around November of 2014, St. Malachy asked H.S. to leave because she was not conforming to the school's dress code and because Mother had not paid her portion of H.S.'s tuition. Father had paid his portion.

[14] After being notified of the school's request, Father met with the principal at St. Malachy to try to get H.S. back into the school, and the principal agreed to re-admit H.S. if the parents would sign documents stating that they would comply

with the school's rules. Father signed his document, but Mother did not sign hers. Instead, the next day Mother asked for St. Malachy to transfer H.S. to Central Elementary School, which was in Mother's school district. At Central Elementary, Mother again omitted Father's name from H.S.'s records. She also signed her name as Angel Bodenhamer on a progress report, even though she and Bodenhamer were not married.

[15] As of the time of Elliott's DRCB report, Mother was again considering transferring H.S. to another school, New Augusta, although she had not done so. New Augusta is Pike Township's magnet school for children "who are excelling." (Tr. 214). Father did not know that Mother was considering this transfer until Elliott informed him. As of the time of the final hearing in this case, Mother had transferred H.S. to New Augusta without consulting Father.

[16] Shortly after Elliott submitted her report, the parents began the co-parenting classes recommended by Heiney's first DRCB report. They were referred to an organization called Dyvyne Interventyon, and Regyna Yates ("Yates") became their co-parenting mentor there. When Yates called the parents to set up meetings, Mother was uncooperative at first. She set up a couple of appointments initially but did not follow through. She told Yates that she did not want to start the classes because she was upset about Paternal Grandmother's CPS report. Father cooperated with Yates from the start and began individual co-parenting sessions. Eventually, on July 14, 2014, Mother cooperated with Yates and began her individual sessions. In total, each of the parents completed eight individual sessions and two joint sessions. The parents were supposed to complete four joint

sessions, but Father refused to continue after the first two because he talked to his lawyer and believed he was not required to complete the last two.

[17] Based on her interactions with Mother and Father, Yates determined that they needed to engage in more co-parenting and some anger management because she detected a lot of "hostility and tension" between them. (Tr. 50). She also noticed that the parents tended to focus on their past history and grievances and would treat co-parenting as "tit-for-tat", meaning that each parent would justify his or her behaviors on the basis that the other parent had behaved similarly. (Tr. 63). For example, Father justified his failure to notify Mother that one of the girls had burned herself on the stove by pointing out that Mother had not notified him when one of the girls had gotten hurt riding her bicycle.

[18] As for Father, Yates observed that it was apparent that he loved both of his daughters. However, she also commented that he needed to work on disciplining the girls at an age-appropriate level, requiring accountability, and establishing a routine for the girls. Father lived with Grandmother, and Yates believed that when the children were with him in Grandmother's home, Grandmother parented the two girls more than Father did. Father told Yates that he intended to move into a home separate from Grandmother and was in the process of renovating the home, but when Yates checked it, she did not see any progress. Instead, it "appeared to be storage." (Tr. 53).

[19] At the conclusion of the parents' co-parenting sessions, Yates determined that Mother was "more equipped to parent." (Tr. 67). However, she recommended

continued co-parenting classes to deal with the parents' ongoing tension. She said that she did not have an opinion on which parent should receive custody because she did not "have all the prior information." (Tr. 50).

[20] On October 27, 2014 and December 10, 2014, the trial court held a hearing on Father's petition to dissolve the parents' marriage and the issue of custody of the children. Elliott and Yates testified to the above factors that had formed the bases for their reports. In addition, they, Mother, and Father testified to other points of contention between Mother and Father. Mother alleged that Father had been abusive and violent during their relationship and that Grandmother smoked marijuana. Father and Grandmother denied these allegations, however, and Elliott and Yates testified that none of the claims had been substantiated. Father also emphasized that Mother had lied to H.S.'s schools and the public about her relationship with Bodenhamer. Mother admitted that, in addition to her misrepresentations to the schools, she had portrayed herself as married to Bodenhamer for over a year on Facebook and had told the children that she had already divorced Father, even though she was not married to Bodenhamer and her divorce from Father had not been finalized.

[21] The witnesses at the hearing also repeatedly discussed examples of Mother and Father's refusal to communicate. For instance, there was a question about whether H.S. received her immunizations twice because they would not discuss the matter. Father, however, testified that he had called the children's doctor, and the doctor had said it was not possible that she had received duplicate shots.

[22] In support of his request for custody, Father also noted that he had cared for the children without Mother—although Grandmother had helped him to provide the care—for 88 days in 2010 while Mother was incarcerated for a 2005 conviction for felony identity deception.

[23] Throughout the trial, the trial court discussed the parents' lack of credibility and the difficulty of deciding which one of them should have custody. At one point, the trial court stated:

> He can testify to what he knew, she can testify to what she knew, and I can sit here and be constantly amazed how irresponsible they both are not to be able to communicate about immunization. . . . And if they can't even talk about that, they're not – are they? – they're not going to be able to talk about anything.

(Tr. 81). Later, the trial court called the parents "two almost pathological liars." (Tr. 258). Finally, the trial court stated:

> I'm getting a little tired of this, to be very truthful with you. I've got to decide where the custody of these children go, and I think right now I can fairly say that I think they ought to be in an orphanage, but I can't put them in an orphanage, so I've got to decide between which parent.

(Tr. 227).

[24] At the conclusion of the trial, the trial court took the matter under advisement. Then, on December 17, 2014, it issued its decree of dissolution of the marriage. In the decree, the court ordered that Father have sole legal and primary physical custody of the children and that Mother have parenting time according to the

Indiana Parenting Time Guidelines, plus any other additional times that the parties could agree upon. Mother now appeals.

# Decision

[25] On appeal, Mother argues that the trial court abused its discretion by awarding primary physical and sole legal custody to Father. Her argument has four components, but we will only address three.[3] First, Mother argues that the trial court abused its discretion procedurally by failing to enter detailed findings of fact and conclusions thereon. Second, Mother argues that the trial court abused its discretion substantively by determining that it was in the best interests of the children that Father have custody. And, third, Mother argues that, even if it was in the children's best interests that Father have custody, the trial court should have awarded joint, rather than sole, legal custody. We will address each of these arguments in turn.

---

[3] Mother's remaining argument is premised on her belief that we should consider the trial court's decree a modification of custody rather than an initial custody determination. She argues that, because the parties agreed at the provisional hearing that she would be the primary care provider, custody was established at the provisional hearing and the trial court's dissolution decree modified a pre-existing custody order. The difference between a modification of custody and an initial custody determination is significant because the standard for an initial custody determination is "less [] stringent," and both parents are presumed equally entitled to custody. *Kondamuri v. Kondamuri*, 852 N.E.2d 939, 945 (Ind. Ct. App. 2006). However, we do not agree that Mother established custody by acting as primary caregiver or by agreeing to temporary custody at the provisional hearing. A preliminary order of custody is simply a temporary order. *See* I.C. § 31-15-4-13 ("The issuance of a provisional order is without prejudice to the rights of the parties or the child as adjudicated at the final hearing in the process."); *Kondamuri*, 852 N.E.2d at 945 (holding that, even though a provisional order had granted Father temporary custody for a year and a half, the subsequent custody determination was an initial custody determination rather than a modification of custody). Thus, the trial court was making an initial custody determination at the dissolution and custody hearing here, and we will not address Mother's argument based on the modification of custody standard.

## 1. Findings of Fact and Conclusions Thereon

First, Mother argues that the trial court abused its discretion procedurally by failing to enter specific findings of fact and conclusions thereon as part of its decree of dissolution, although she does not cite any legal authority for this contention. She suggests that, because the trial court did not enter findings, there was no evidence that it considered the statutory factors it was required to consider to determine the best interests of the children under INDIANA CODE § 31-14-13-2 for an initial custody determination.

We disagree with Mother's first contention because it is well-settled that unless parties request findings under Indiana Trial Rule 52(A), a trial court is not required to make specific findings. *See Hegerfeld v. Hegerfeld*, 555 N.E.2d 853, 856 (Ind. Ct. App. 1990) (addressing the prior version of the initial custody determination statute and holding that a trial court is not required to enter detailed findings regarding the best interests of the child unless requested); *Nunn v. Nunn*, 791 N.E.2d 779, 787 (Ind. Ct. App. 2003) (considering a general judgment for an initial custody determination); *see also In re Paternity of P.R.*, 940 N.E.2d 346, 351 (Ind. Ct. App. 2010) (holding that, in a custody modification order, the trial court is not required to enter special findings regarding the change in the best interests of the child unless requested).[4] Mother states that she requested findings, but she does not

---

[4] Mother cites *Green v. Green*, 843 N.E.2d 23 (Ind. Ct. App. 2006), where we held that the trial court had not properly considered the required statutory factors in a custody modification decision. However, *Green* concerned a modification of custody rather than an initial custody determination, and we have repeatedly held that there are significant differences between a modification of custody and an initial custody

include a citation to the record to support that assertion, and we do not find any evidence in the record to support it. In addition, at the end of the hearing, the trial court granted the parents five days to submit proposed orders, and according to the chronological case summary, neither parent did so. Accordingly, we conclude that the trial court did not abuse its discretion by failing to enter findings of fact and conclusions thereon.

[28] Instead, with respect to Mother's second contention, it is clear from the record that the trial court considered the best interests of the children, in spite of the fact that the court did not enter special findings. INDIANA CODE § 31-14-13-2 provides that, when making an initial custody determination:

> [t]he court shall determine custody in accordance with the best interests of the child. In determining the child's best interests, there is not a presumption favoring either parent. The court shall consider all relevant factors, including the following:
>
> > (1) The age and sex of the child.
> >
> > (2) The wishes of the child's parents.
> >
> > (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
> >
> > (4) The interaction and interrelationship of the child with:
> >
> > > (A) the child's parents;

---

determination. *See in re Paternity of Winkler*, 725 N.E.2d 124 (Ind. Ct. App. 2000). Whereas in an initial custody determination, there is not a presumption favoring either parent, a "more stringent standard governs requests for modification of custody." *Id.* at 124. This "stricter rationale is required to support a change in custody because 'permanence and stability are considered best for the welfare and happiness of the child.'" *Id.* (quoting *Lamb v. Wenning*, 600 N.E.2d 96, 98 (Ind. 1992)). Therefore, we do not find *Green* on point.

(B) the child's siblings; and

(C) any other person who may significantly affect the child's best interest.

(5) The child's adjustment to home, school, and community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian . . . .

[29] Here, the trial court repeatedly expressed frustration at the parents' attempts to introduce testimony that did not relate to the best interests of the child. At one point, the trial court stated: "Let's move on to the substantive issues, like best interest of the child, why those were her impressions, why did she make these recommendations, were there any questions in her mind about the credibility of the informants . . . ." (Tr. 36). Later, the trial court stated that it still had not heard evidence that "hit the nail on the head of the best interests of the child." (Tr. 123). In light of this evidence, we conclude that the trial court properly considered the best interests of the children, even though it did not enter special findings on the issue.

## 2. Best Interests

[30] Next, Mother argues that the trial court abused its discretion substantively because it should have found that it was in the children's best interests for her to have custody. Where, as here, the trial court did not make special findings, we review

the trial court's decision as a general judgment and, without reweighing the evidence or considering witness credibility, will affirm if sustainable upon any theory consistent with the evidence. *Wolljung v. Sidell*, 891 N.E.2d 1109, 1111-12 (Ind. Ct. App. 2008). Judgments in custody matters generally turn on essential factual determinations and will be set aside only when they are clearly erroneous. *Id.* at 1112. We will not substitute our own judgment if any evidence or legitimate inferences support the trial court's judgment. *Id.*

[31] To support her argument, Mother cites to evidence which purports to show that Father is the less fit parent and that she should have custody. However, there is an equal amount of evidence demonstrating that she is the less fit parent, and the trial court made it clear that it did not consider either of the parents commendable options for custody. Frequently, trial courts are required to make difficult decisions in custody disputes, and it is not our place to reweigh the evidence— especially where, as here, the trial court indicated that it did not find either party completely credible. Instead, we conclude that there was sufficient evidence for the trial court to determine that Father's custody was in the children's best interests. The evidence of the ages and sex of the children, the parents' wishes, and the children's wishes do not weigh in favor of either parent. As for the children's interactions with their parents, siblings, and other people who might significantly affect the children's best interests, Elliott testified that Father loved the children and that they got along well with him and Grandmother, with whom he lived. In addition, Father was able to provide the children with a stable home and school environment, whereas H.S. was enrolled in four schools in one year under

Mother's care.  Finally, the DRCB report indicated that Father's only potential issue with his mental and physical health was his inability to recognize his own negative emotions.  As for Mother's allegations that Father had been violent throughout their marriage, none of her allegations were substantiated, and there was never any evidence or allegations that Father was violent towards the children. In light of these factors, we conclude that the trial court did not abuse its discretion in determining that Father's custody was in the best interests of the children.

### 3. Legal Custody

[32] Finally, Mother argues that the trial court abused its discretion in awarding Father sole legal custody because it should have instead considered the factors for awarding joint legal custody.  Under INDIANA CODE § 31-17-2-13, the court "may award legal custody of a child jointly if the court finds that an award of joint legal custody would be in the best interests of the child."  As we stated above, child custody determinations fall squarely within the discretion of the trial court and will not be disturbed except for an abuse of discretion.  *Troyer v. Troyer*, 987 N.E.2d 1130, 1145 (Ind. Ct. App. 2013), *reh'g denied*, *trans. denied*.  We will not reverse the trial court's decision unless it is against the logic and effect of the facts and circumstances before it or the reasonable inferences drawn therefrom.  *Id.*  "'On review, we will not reweigh evidence, judge the credibility of the witnesses, or substitute our judgment for that of the trial court.'"  *Id.* (quoting *Farag v. DeLawter*, 743 N.E.2d 366, 368 (Ind. Ct. App. 2001)).

[33] In determining whether an award of joint legal custody would be in the best interests of the child, the trial court should consider:

> (1) the fitness and suitability of each of the persons awarded joint custody;
>
> (2) whether the persons awarded joint custody are willing and able to communicate and cooperate in advancing the child's welfare;
>
> (3) the wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age;
>
> (4) whether the child has established a close and beneficial relationship with both of the persons awarded joint custody;
>
> (5) whether the persons awarded joint custody:
>
>> (A) live in close proximity to each other; and
>>
>> (B) plan to continue to do so; and
>
> (6) the nature of the physical and emotional environment in the home of each of the persons awarded joint custody.

I.C. § 31-17-2-15. Because the trial court's judgment was a general judgment, we may affirm on any theory supported by the evidence adduced at the hearing. *Nunn*, 791 N.E.2d at 787.

[34] First, we must note that there is no evidence in the record that Mother even requested joint custody. However, even if she did, the trial court's sole custody order was not an abuse of discretion. Elliott concluded in her DRCB report that "[d]ue to the parents' inability to co-parent, a joint custody arrangement is not

feasible." (Confidential App. p. 31).[5] Mother also admitted that she had refused to accept Father's telephone calls for a month and that she had repeatedly made decisions about H.S.'s schooling without consulting Father. In addition, the trial court concluded that the parents could not communicate to the extent necessary for joint custody when it stated:

> He can testify to what he knew, she can testify to what she knew, and I can sit here and be constantly amazed how irresponsible they both are not to be able to communicate about immunization. . . . And if they can't even talk about that, they're not – are they? – they're not going to be able to talk about anything.

(Tr. 81). In light of the parents' inability to communicate, we conclude that the trial court did not abuse its discretion in awarding Father sole legal custody. *See* I.C. § 31-17-2-15(2); *Nunn*, 791 N.E.2d at 787 (finding that evidence that the parties had a difficult time communicating was sufficient to justify an award of sole legal custody).

[35] Affirmed.

Vaidik, C.J., concurs.

Robb, J., concurs in result.

---

[5] Mother's Appendix Volume 2 contains documents that were excluded from public access. As such, this Appendix was filed on green paper and marked as "Not for Public Access." *See* Ind. Admin. Rule 9. We have attempted to exclude such matters from this opinion. However, to the extent such matters are included in this opinion, we deem such information to be "essential to the resolution of [the] litigation" or "appropriate to further the establishment of precedent or the development of the law." *See* Admin. R. 9(G)(3); 9(G)(7)(a)(ii)(c),(d).