

FILED

Sep 08 2016, 9:25 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Karen Yvonna Renfro
New Albany, Indiana

ATTORNEY FOR APPELLEE

Michael N. Red
Morse & Bickel, P.C.
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

Carl Wayne Montgomery,

*Appellant-Petitioner,*

v.

Patricia Ann Montgomery,

*Appellee-Respondent.*

September 8, 2016

Court of Appeals Cause No.
10A01-1511-DR-1910

Appeal from the Clark Circuit
Court

The Honorable Vicki Carmichael,
Judge

Trial Court Cause No.
10C04-0911-DR-256

**Barnes, Judge.**

## Case Summary

[1] Carl Montgomery ("Father") appeals the trial court's order modifying custody of his daughter in favor of Patricia Ann Montgomery ("Mother"). We reverse and remand.

# Issues

The issues before us are:

    I.      whether the trial court's decision to modify custody is supported by the evidence; and

    II.    whether the trial court properly ordered Father to pay $7,500.00 towards Mother's attorney fees.

# Facts

During the parties' marriage they had one child, A.M., who was born in November 2008. In November 2009, Father petitioned for divorce in Clark County, based on the parties' residence in Clarksville. Mother moved to Minnesota and was granted provisional primary custody of A.M. but frequently interfered with Father's parenting time. In August 2011, the trial court entered an emergency order transferring custody of A.M. to Father, but A.M. remained in Minnesota with Mother. On June 19, 2012, the trial court entered a final dissolution decree in which Father was granted sole legal and physical custody of A.M., and the decree ordered Mother to deliver A.M. to Father immediately. The decree further specified, "law enforcement officials in Minnesota or elsewhere are hereby ordered to assist with this endeavor, as it is presumed that [Mother] will not be cooperative." App. p. 25. Additionally, Mother was not granted any parenting time due to her failure to appear at the final dissolution hearing and her prior interference with Father's parenting time. In July 2012, Mother appeared before the trial court and filed a request for parenting time. In

November 2012, the parties agreed to a parenting time schedule that was approved by the trial court; the agreement and order granted parenting time to Mother in accordance with the Indiana Parenting Time Guidelines where significant distance is a factor. This order did not alter the award of sole legal custody to Father.

[4] At some point, Mother moved to Wisconsin and began living with Gary Best. On August 23, 2013, Father filed a rule to show cause and motion to modify parenting time. The motion alleged in part that Mother failed to pay Father $8,296.24 in attorney fees she had previously been ordered to pay and $2,500.00 in damages awarded to Father. The motion further alleged Mother had not been paying the full amount of child support she had been ordered to pay. The motion further stated that Mother was living with a boyfriend, i.e. Best, who had at least two convictions for battery in Wisconsin and/or Minnesota, possibly involving domestic partners, and that this warranted an alteration of Mother's parenting time. On September 28, 2013, Father filed a petition for a protective order against Mother, alleging she was stalking him by repeatedly sending harassing text messages. Also, Father alleged that Mother's "boyfriend assaulted my daughter on her last visit & I am pursuing criminal action against him . . . ." *Id.* at 38. Although the CCS indicates that a hearing was scheduled on Father's rule to show cause and motion to modify parenting time for October 28, 2013, there is no indication that the trial court ever ruled on the motions. As for the protective order request, on November 27, 2013, the trial court entered a "Joint Temporary Restraining Order Issued Under Trial Rule

65(E)(2)" at the parties' mutual request, precluding each party from harassing or battering the other or coming onto the other's property.[1]  *Id.* at 40.

[5]     On December 17, 2013, Father filed an "Emergency Motion to Modify Parenting Time," in light of Mother's approaching parenting time for the holidays.  *Id.* at 42.  In the motion, Father alleged that A.M. was afraid of Best and that A.M. had told Father Best previously struck A.M. and Mother while A.M. was sitting in Mother's lap.  The motion also stated that Father took A.M. to a psychologist and counselor, Meg Hornsby, who believed A.M. had not fabricated the battery incident or her fears of Best.  On December 27, 2013, the parties' parenting time coordinator, Rebecca Lockard, filed an entry with the trial court stating Mother should have parenting time with A.M. from December 28, 2013 through January 4, 2014.  Lockard's entry also stated that she was aware of Father's accusations against Best and Hornsby's concerns, but that "Child Protective Services investigated the incident and found no reason to be involved or supervise any contact between the child and Gary Best."  *Id.* at 44.  However, Father refused to deliver A.M. to Mother at that time.

[6]     On January 14, 2014, the trial court held a telephonic pretrial conference with the parties.  During the hearing, Mother denied any physical abuse or threat of abuse by Best against her or A.M.  After the hearing, the trial court ordered that

---

[1] Although the order states that it was issued under Indiana Trial Rule 65(E)(2), that rule governs temporary restraining orders precluding harassing behavior in domestic relations cases and specifically states, "A joint or mutual restraining order shall not be issued."

Mother be granted makeup visitation time beginning on January 18, 2014, for a two-week period. The trial court also appointed a guardian ad litem ("GAL"), Brittany Wilson, to investigate the case and submit a report to the court.

[7] On January 15, 2014, Hornsby sent a letter to the trial court. In the letter, Hornsby recommended that Best not be present during any of Mother's parenting time with A.M. based on A.M.'s reports of physical abuse by Best. Hornsby also recommended that Father and Mother work with her (Hornsby) to develop a safety plan for A.M.

[8] On January 16, 2014, Father filed, in Wisconsin, a request for a temporary restraining order preventing Best from having any contact with A.M. The Wisconsin court granted the request, effective through January 27, 2014. Also on January 16, Father filed in Indiana a "Renewed Motion for Modification of Order for Parenting Time or in the Alternative Motion for an Amended Parenting Order to Include a Safety Plan." *Id.* at 57. In response to this latest motion, the trial court entered an ex parte order preventing Best from being present for any parenting time between Mother and A.M. and scheduled another pretrial conference for January 28, 2014.

[9] During the conference on January 28, 2014, Mother again denied any physical abuse by Best. After the hearing, the trial court entered an order directing that Mother be allowed two weeks of parenting time beginning February 1, 2014, and without any restrictions on Best being present. Mother did end up having

two weeks of parenting time in February, delayed by one week for weather concerns and not Father's actions.

[10] Mother was granted another week of parenting time in April 2014. Before that visitation was to occur, the GAL wrote a letter to the trial court expressing concern that Best should not be present during any parenting time. The GAL also recommended that Father provide Mother with medical and schooling information for A.M., which he had not been doing. The trial court did not enter any order restricting Best from being present during parenting time in response to the GAL's letter, and the parenting time took place as scheduled.

[11] Meanwhile, Mother's attorney filed a subpoena with Hornsby, requesting copies of A.M.'s counseling records. Hornsby resisted this subpoena and sought a protective order, but the trial court denied it and required Hornsby to provide the records. She never did so, however.

[12] At the conclusion of Mother's parenting time in April 2014, she went to her attorney's office in Indianapolis and arranged for a video recording to be made of A.M. without A.M.'s knowledge, interacting with Mother, Best, and Mother's attorney. In the video, Mother, A.M., Best, and Mother's attorney are eating pizza together in a conference room. A.M. sat next to Best and freely interacted with him without apparent fear. A.M. referred to Best as "dad" or "daddy." Ex. 1. After a while, Mother left the room on the pretense of having to put more money in a parking meter. A.M. initially wanted to go with Mother, but she told A.M. to stay in the room. Then, Best said he had to go to

the restroom. Again, A.M. wanted to go with him but he told her it was improper for her to do so, and she stayed in the room alone with Mother's attorney. As Best was leaving, A.M. said, "I love you in the whole planet." *Id.* Mother's attorney then engaged in conversation with A.M. A.M. said that it was her "dream" to stay with Mother and that Best had told her that her dream would come true. *Id.* Mother's attorney asked A.M. whether she was afraid of Best, and she responded, "Carl wants me to believe I am but I am not." *Id.* Mother's attorney also asked whether Best had ever hurt her and A.M. responded, "No. Carl just wanted me to ask him why." *Id.* A.M. denied or did not remember having ever talked to Hornsby. A.M. stated that she did not tell the GAL that she wanted to live with Mother because she was afraid of making the GAL mad. She also claimed to be sad that she was going back to Father's house that day. A.M. also denied having been told by someone else to say the things she said to Mother's attorney.

[13] Mother's attorney sent a copy of this video to the GAL, who viewed it before submitting a report to the trial court on May 15, 2014.[2] Among other things, the GAL noted having reviewed a recent criminal case against Best in Wisconsin for third degree felony assault resulting in serious bodily injury and that she was troubled by the behavior it described, though it was committed

---

[2] Mother has insinuated that the GAL did not view the video before writing her report. However, the report clearly states that the GAL reviewed "videos submitted by the parties or their counsel," and she further testified clearly during the custody modification hearing that she viewed the video before writing her report. App. p. 66.

against a co-worker.[3]  The GAL also noted that Father had improperly been withholding information from Mother regarding A.M.'s education, health care, and other issues, and that he needed to stop doing so.  The GAL also had concerns that Mother was attempting to portray Best to A.M. as her real father while referring to Father as "Carl," which, indeed, would seem to be reflected by the video made in Mother's attorney's office.  The GAL recommended in part:

> [Mother] should continue to have parenting time as ordered by the Court.  However, Gary Best should not be present for any parenting time with [A.M.] at this time.  Of course, I can never say for sure that this incident where Gary hit [A.M.] occurred, however, [A.M.]'s demeanor and the details she revealed lead me to believe something happened at [Mother]'s home.  [A.M.]'s allegation combined with Mr. Best's arrest and subsequent guilty plea for Felony Assault, give me cause for great concern with regard to [A.M.]'s safety with Gary present.  To be clear, I am not limiting [Mother]'s parenting time with her daughter.  I believe that [Mother] should be able to exercise her parenting time and make arrangements such that Gary is not present for the time being.

App. at 69.

[14]  On May 13, 2014, Mother filed a petition to modify child custody in her favor. In addition to moving to modify custody, Mother filed a motion in limine to

---

[3] Father has not submitted any evidence that Best has any prior domestic battery convictions, as alleged in his August 23, 2013 motion to modify parenting time.

exclude any reliance upon Hornsby's opinions regarding A.M. because of Hornsby's refusal to supply counseling records to Mother and her attorney. Unfortunately, and after a failed attempt at mediation, the trial court did not begin conducting a hearing on the petitions until May 18, 2015. In the meantime, Father and his attorney at the time did not cooperate with the parenting time coordinator, Lockard, with respect to scheduling summer 2014 parenting time for Mother with A.M., and none took place until October 2014. In total, under the Indiana Parenting Time Guidelines, based on A.M.'s age and the distance between the parties, Mother was entitled to six weeks of parenting time in 2013 but only received four weeks. In 2014, Mother was entitled to nine weeks of parenting time but only received six weeks.

[15] During the hearing on May 18, 2015, Mother presented her testimony and that of Lockard. Mother denied any history of violence between her and Best or between Best and A.M., and the April 2014 video of A.M. was played. Mother did admit to Best's felony battery conviction in Wisconsin, which apparently was entered in May 2014, and which resulted in serious bodily injury to the victim. Mother also testified as to Father's uncooperativeness with providing information on such things as A.M.'s medical care and education and with providing his correct address to her. Lockard testified as to difficulty she had in the past working with Father, culminating in a threat in September 2014 to quit serving as coordinator. However, Lockard also stated that, after Father told her to communicate directly with him and not his previous attorney, and after he obtained a new attorney, the communication issues improved. Mother

presented no evidence as to her current housing arrangements in Wisconsin, or where A.M. would attend school, or extracurricular activities in which A.M. could participate. The GAL also testified at this hearing and stated that she could not definitively say whether her recommendation from May 2014 was still valid, as she had not spoken to A.M. or the parties since then.[4] Regardless, her May 2014 report was introduced into evidence. At the conclusion of the hearing, the trial court entered a summer parenting time order for A.M. and Mother, and Father did not attempt to interfere with that order. There is no evidence that Mother was deprived of any parenting time to which she was entitled in 2015 or at anytime since fall 2014; in fact, Father had voluntarily offered a week of parenting time to Mother during spring break in 2015.

[16] The trial court continued the hearing to June 15, 2015. On that date, Father testified, as well as A.M.'s godmother, a family friend, and Father's sister. Father presented evidence as to his employment and day care arrangements, and his appropriate household and positive relationship with A.M., as well as her finishing kindergarten and preparing to enter first grade in the fall, her friends from school and church, and her participation in dancing and tumbling classes. Mother did not dispute any of the evidence that A.M. has been well cared-for by Father, aside from his interference with Mother's parenting time in

---

[4] The GAL referred to Best as Mother's "paramour" during this hearing. Tr. p. 98. Before the trial court and this court, Mother has implied that the GAL was using the term in a derogatory fashion. We cannot glean that the GAL intended any such meaning. "Paramour" may mean "an illicit lover, especially of a married person," or simply "any lover." *See* Dictionary.com (last visited June 21, 2016).

2013 and 2014. Father did not present any evidence to attempt to substantiate his earlier claim that Best had battered A.M. Also, Hornsby was not called to testify.

[17] In addition to custody matters, Mother also presented evidence that she had incurred nearly $18,000 in attorney fees in the past two years in fighting Father's attempts to limit her parenting time and in moving to modify custody. During his testimony, Father began discussing Mother's failure to pay him previously-ordered attorney fees, but he was not allowed to do so because of Mother's objection.

[18] On October 9, 2015, the trial court entered an order granting Mother's petition to modify custody. The order contained some findings and conclusions, largely following Mother's proposed order; neither party requested written findings and conclusions under Indiana Trial Rule 52(A). However, although Mother's proposed order contained provisions striking Hornsby's opinions from the record, the trial court's order did not. The trial court did state in part, "In an attempt to bolster his renewed allegations against Mr. Best, and notwithstanding that the provisions of Rule 704(b) of the Indiana Rules of Evidence prohibit expert testimony concerning 'the truth or falsity of allegations' or 'whether a witness has testified truthfully,' or 'legal conclusions,' [Father] states that he had enlisted the assistance of psychological counselor Meg Hornsby . . . ." *Id.* at 93. The trial court noted the evidence presented by Father as to his responsibility and care for A.M. and her positive living conditions; it did not discuss the evidence at length because Mother did not

dispute that evidence. Ultimately, the trial court found that Father "has fabricated the allegation that Mr. Best assaulted [A.M.] in order to disrupt [A.M.]'s frequent, meaningful, and continuing contact with [Mother]." *Id.* at 103. The trial court also found that Father "has deliberately concealed [A.M.]'s school, medical, counseling, daycare, and dental records, and even his and [A.M.]'s own address, from [Mother], all in violation of the Court's orders." *Id.* Based upon these findings, the trial court granted Mother legal and physical custody of A.M., with Father having distance-related parenting time under the Parenting Time Guidelines. The trial court also ordered Father to pay $7,500.00 toward Mother's attorney fees; it did not mention Mother's outstanding debt to Father for attorney fees and other damages. Father now appeals. The trial court denied Father's request to stay implementation of the custody modification during the pendency of this appeal.

# Analysis

## I. Modification of Custody

[19] The trial court entered findings and conclusions in this case sua sponte. In such a case, the specific findings control only with respect to issues they cover, and a general judgment standard applies to issues outside the findings. *In re Marriage of Sutton*, 16 N.E.3d 481, 484-85 (Ind. Ct. App. 2014). "The trial court's findings or judgment will be set aside only if they are clearly erroneous." *Id.* at 485. A finding is clearly erroneous only if there are no facts or inferences drawn therefrom to support it. *Id.*

[20] We acknowledge the well-established preference in Indiana "'for granting latitude and deference to our trial judges in family law matters.'" *Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016) (quoting *In re Marriage of Richardson*, 622 N.E.2d 178 (Ind. 1993)). "Appellate courts 'are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence.'" *Id.* (quoting *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002). In order to reverse a trial court's ruling, it is not enough that the evidence might have supported a different conclusion. *Id.* Rather, the evidence must positively require the conclusion contended for by appellant we may reverse. *Id.* We may not reweigh the evidence or reassess witness credibility, and the evidence should be viewed in a light most favorable to the judgment. *Id.* (quoting *Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011)). Still, although we must be highly deferential to trial courts in cases such as this, that deference is not absolute. *See Kirk*, 770 N.E.2d at 307 n.5 ("This is not to say that the circumstances of a custody or visitation case will never warrant reversal.").

[21] Pursuant to Indiana Code Section 31-17-2-21, a trial court may not modify a child custody order unless a noncustodial parent shows both that modification is in the best interest of the child, and there has been a substantial change in one or more of the factors listed under Indiana Code Section 31-17-2-8. Those factors are:

> (1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

> (A) the child's parent or parents;

> (B) the child's sibling; and

> (C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

> (A) home;

> (B) school; and

> (C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 8.5(b) of this chapter.

A parent seeking modification of custody bears the burden of proving that the existing custody order should be altered. *Steele-Giri*, 51 N.E.3d at 124 (citing *Lamb v. Wenning*, 600 N.E.2d 96, 98 (Ind. 1992)). "Indeed, this 'more stringent standard' is required to support a change in custody, as opposed to an initial custody determination where there is no presumption for either parent because 'permanence and stability are considered best for the welfare and happiness of the child.'" *Id.* (quoting *Lamb*, 600 N.E.2d at 98).

[22] When evaluating whether a change of circumstances has occurred that is substantial enough to warrant a modification of custody, the context of the whole environment must be judged, "'and the effect on the child is what renders a change substantial or inconsequential.'" *Sutton*, 16 N.E.3d at 485 (quoting *Jarrell v. Jarrell*, 5 N.E.3d 1186, 1193 (Ind. Ct. App. 2014), *trans. denied*). Generally, cooperation or lack thereof with custody and parenting time orders is not an appropriate basis for modifying custody. It is improper to utilize a custody modification to punish a parent for noncompliance with a custody order. *In re Paternity of M.P.M.W.*, 908 N.E.2d 1205, 1208 (Ind. Ct. App. 2009). "However, '[i]f one parent can demonstrate that the other has committed misconduct so egregious that it places a child's mental and physical welfare at stake, the trial court may modify the custody order.'" *Maddux v. Maddux*, 40 N.E.3d 971, 979 (Ind. Ct. App. 2015) (quoting *Hanson v. Spolnik*, 685 N.E.2d 71, 78 (Ind. Ct. App. 1997), *trans. denied*).

[23] Here, the primary reasons identified by the trial court for modifying custody in favor of Mother were Father's denial of some of Mother's parenting time in

2013 and 2014 and, relatedly, Father's allegation that Best had assaulted A.M. The trial court found that allegation to be fabricated. Father does not dispute that, during the 2013-2014 time period, Mother was entitled under the Parenting Time Guidelines to a total of fifteen weeks of parenting time but received only ten weeks total. Father does not concede that he fabricated the assault allegation against Best. Because Mother denied that it occurred, we cannot second-guess the trial court's determination that it did not. The question, therefore, is whether this evidence is enough to warrant a modification of custody. We conclude it is not.

[24] We first note that the trial court made no finding as to what circumstance substantially changed under Indiana Code Section 31-17-2-8 that warranted a modification of custody. It is true that in some cases, a custodial parent's interference with a noncustodial parent's visitation rights may be of such a degree that it represents a substantial change in the parties' relationship and the parties' relationship with their children under subsection (4) of Indiana Code Section 31-17-2-8. *See In re Paternity of J.T.*, 988 N.E.2d 398, 400-01 (Ind. Ct. App. 2013); *In re Marriage of Kenda & Pleskovic*, 873 N.E.2d 729, 738-39 (Ind. Ct. App. 2007), *trans. denied*. On the other hand, it is well-settled that in order to support a modification of custody, such interference must be continuing and substantial. *See J.T.*, 988 N.E.2d at 400-01 (noting Mother "engaged in continuing pattern of denial of parenting to time to [Father]" for over two years and despite multiple contempt petitions against Mother); *Kenda*, 873 N.E.2d at 738 (noting Mother "desired to prohibit Father from exercising parenting time

that was not supervised by her, which resulted in Father being completely cut off from having a relationship with his son"; Mother also moved to England with child without prior permission). And, while we accept that any interference with a noncustodial parent's visitation rights "is a serious matter and in some cases may be a factor relevant to the issues of both a change in circumstances and the child's best interests," not all such interference justifies a modification of custody. *Johnson v. Nation*, 615 N.E.2d 141, 147 (Ind. Ct. App. 1993). In *Johnson*, we reversed a modification of custody that had been based upon the custodial father's purported interference with the mother's parenting time, where the mother nonetheless was able to have "regular, meaningful visitation with her children" and there was no evidence that the father's interference "had a harmful physical or emotional effect on the children." *Id.* at 147.

[25]  In the present case, we first observe that, to the extent Mother and Father have a highly-acrimonious relationship when it comes to A.M., that is not a new or recent development or a changed circumstance. Indeed, the primary reason Father was granted custody of A.M. in the original dissolution decree was because of Mother's complete denial of parenting time to Father for long periods of time while the dissolution was pending. Mother disregarded an August 2011 order for Father to have immediate custody of A.M. until June 2012, at which time the trial court anticipated that law enforcement assistance

would be needed to turn A.M. over to Father's care.[5] That the parties have proven to be unable to cooperate when it comes to A.M. is a very unfortunate circumstance, but not a new or changed one.

[26] It also is difficult to say that Father's interference with Mother's parenting time in 2013 and 2014 denied her all regular and meaningful visitation with A.M. Father's actions deprived Mother of five out of the fifteen weeks of parenting time to which she was entitled. That is not ideal. It was not, however, a complete cessation of the relationship between Mother and A.M. Mother never sought to hold Father in contempt for not granting her parenting time. And, beginning in October 2014, regular parenting time between Mother and A.M. had resumed. Prior to the May 2015 modification hearing, the parties had agreed between themselves, without the assistance of the parenting time coordinator, to Mother having a week of parenting time over spring break. Also, although Mother argues Father was attempting to avoid scheduling summer 2015 parenting time for Mother, the parenting time coordinator testified as to her understanding that the issue would be resolved at the May 2015 hearing. In fact, after open-court discussion of the matter at the end of that hearing, summer 2015 parenting time was scheduled and did occur without

---

[5] Under Indiana Code Section 31-17-2-21(c), a court ruling on a custody modification petition may not consider evidence "on a matter occurring before the last custody proceeding between the parties unless the matter relates to a change in the factors relating to the best interests of the child as described by section 8 and, if applicable, section 8.5 of this chapter." Here, evidence of Mother's pre-dissolution interference with Father's parenting time is relevant to assessing whether there was a change in circumstances regarding the parties' relationship.

any evidence of interference by Father. The parenting time coordinator also indicated that prior difficulties in scheduling parenting time with Father had greatly lessened since Father's retention of a new attorney and Father's request that the coordinator communicate directly with him and not with counsel.

[27] We additionally note that there is a lack of evidence that Father's interference with Mother's parenting time had any detrimental effect upon A.M.'s mental or physical health. There is no evidence that A.M.'s relationship with Mother was substantially affected, beyond whatever normal stressors may occur whenever divorced parents fight over child custody. *Cf. Cunningham v. Cunningham*, 787 N.E.2d 930, 936 (Ind. Ct. App. 2003) (affirming denial of modification petition and while acknowledging children felt stress caused by divorce and move and living with new stepfamily, there was no evidence "that the children have suffered any additional stress than any other child might feel in those circumstances"). Additionally, to the extent Mother argues Father attempted to instill fear of Best in A.M., by Mother's own account Father ultimately failed in that regard. Mother claims that A.M. had no fear of Best and that this was reflected during the recorded interview at Mother's attorney's office. Furthermore, to the extent Father claimed in late 2013 and early 2014 that Best assaulted A.M., there is no evidence that he has continued to repeat such claims or did so in front of A.M. at any time for over a year prior to the modification hearing. In sum, we cannot say there is evidence of a substantial change in circumstances under Indiana Code Section 31-17-2-8 such as would support a modification of custody.

[28]     Perhaps more crucially, however, we conclude there is scant evidence that modification of custody was in A.M.'s best interests. "Courts certainly should not reward parents who refuse to cooperate in the court's efforts to reunify a child with another parent." *Kirk*, 770 N.E.2d at 308. But, when deciding whether to modify custody, courts must bear in mind:

> "[C]hildren will normally prosper and mature . . . under a standard of consistency better than they will otherwise, even though at any given point in time the noncustodial parent may appear capable of offering 'better' surroundings, either emotional or physical. In the larger sense, the stability in surroundings, schooling, relationships, authority figures, daily routine, economic circumstances, etc. constitute a substantial determinant in assessing the statutorily enumerated factors relevant to a determination of the best interests of the child."

*Id.* (quoting *Kuiper v. Anderson*, 634 N.E.2d 556, 558 (Ind. Ct. App. 1994)).

[29]     Here, Father presented uncontradicted evidence of his housing and A.M.'s current positive living situation, her schooling, her friendships, her church attendance, her extra-curricular activities, and her medical and dental care. There was no evidence that A.M. has been anything but well-cared for and well-adjusted while in Father's custody, as confirmed by several witnesses. Mother does not dispute that. Very importantly the GAL recommended

A.M.'s continued custody with Father.[6]  However, the trial court seemed to give little consideration to this evidence in its findings and order.

[30]  By contrast, Mother presented no evidence whatsoever as to what kind of situation A.M. would be moving into, hundreds of miles away from her current home, school, friends, church, family, and extracurricular activities, and greatly disrupting A.M.'s daily routine.  There was no evidence of nor findings regarding Mother's current housing situation.  There was no evidence of nor findings regarding where A.M. would go to school or the type of neighborhood in which she would live or what kind of extra-curricular activities might be available to her.  And, even if we accept that Best never assaulted A.M. and that she was not afraid of him, the fact remains that he was convicted of felony battery resulting in serious bodily injury—not in the distant past, but during the course of these proceedings.  This should have at least been cause for concern in assessing whether it would be in A.M.'s best interests to live with Mother, which also meant living with Best.  The trial court did not mention Best's battery conviction in its findings or order.

[31]  In light of the uncontradicted evidence of A.M.'s positive living situation with Father, the complete dearth of evidence of what A.M.'s living situation with

---

[6] Mother notes that the GAL's report was filed over a year before the modification hearing, and the GAL could not testify with certainty that her recommendation would be the same because she had not interacted with the parties and A.M. since that time.  However, given that Mother was the one seeking to modify custody, it should have been her burden to demonstrate that something happened in the year since the report had been filed that could or would have changed the GAL's recommendation.

Mother would be like and which move would involve completely uprooting her from her current community, and the lack of evidence that Father's interference with Mother's visitation has substantially or continually impacted Mother's relationship with A.M. or affected A.M.'s mental or physical health, there is insufficient evidence that modifying custody is in A.M.'s best interests. We are left to speculate in what sort of situation the child will find herself.

[32] We must also address Mother's claim that modification of custody was somehow supported by Father's failure to fully provide his current address and records related to A.M., such as dental, doctor, counseling,[7] and educational records. Obviously, in the spirit of cooperation and sound parenting after divorce, Father should have been providing such information, especially after being ordered to do so. However, we do note that Father had sole legal custody of A.M. As such, Father possessed the authority to determine A.M.'s upbringing, including for her education, health care, and religious training. *See* I.C. § 31-17-2-17; *Finnerty v. Clutter*, 917 N.E.2d 154, 156 (Ind. Ct. App. 2009), *trans. denied*. Thus, Father's failure to provide these type of records, while disturbing, did not arise in a situation in which he and Mother shared joint legal custody.

---

[7] The record reveals that it was Hornsby herself, not Father, who resisted Mother's requests for A.M.'s counseling records. Hornsby asserted that the records were confidential and that she was representing A.M.'s interests only in refusing to release them.

Father undoubtedly was not exemplary in his conduct, but being difficult does not and legally cannot support a change in custody. This case presents a rare example in which we conclude it is necessary to reverse a trial court's decision regarding child custody. However, we cannot allow the custody modification to stand where there is a lack of evidence to support that ruling.

## II. Attorney Fees

Father also challenges the trial court's order requiring him to pay $7,500.00 towards Mother's attorney fees. We review a decision to award attorney fees and the amount of any award for an abuse of discretion. *Allen v. Proksch*, 832 N.E.2d 1080, 1102 (Ind. Ct. App. 2005). The trial court relied on two statutes in awarding fees. The first statute is the General Recovery Statute, Indiana Code Section 34-52-1-1(b), which applies in all civil cases and permits an award of attorney fees if either party: "(1) brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless; (2) continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or (3) litigated the action in bad faith." This statute, however, expressly predicates a possible award of attorney fees only to a "prevailing party." *K.S. v. B.W.*, 954 N.E.2d 1050, 1053 (Ind. Ct. App. 2011), *trans. denied*. Ultimately, given our holding that the trial court should not have granted Mother's petition to modify custody, she cannot be deemed a "prevailing party" under the General Recovery Statute.

The second statute is Indiana Code Section 31-17-7-1, which permits a court to periodically order one parent to pay reasonable attorney fees to the other parent

related to maintaining or defending custody and parenting time proceedings. In order to award fees under this statute, a trial court must consider the parties' resources, their economic condition, their ability to engage in gainful employment and earn adequate income, and any other factors bearing on the reasonableness of the award. *Allen*, 832 N.E.2d at 1102. "Misconduct that directly results in additional litigation expenses may properly be taken into account in the trial court's decision to award attorney fees." *Id.* If a trial court does not receive evidence regarding the parties' respective resources, economic condition, income and ability to work, and other factors related to the reasonableness of an award, it is an abuse of discretion to award fees under Section 31-17-7-1. *Id.*

[36] Here, there was little evidence presented regarding the parties' respective economic conditions. The only evidence presented was that Mother earns $15 per hour at her job, while Father earns $17 per hour. Mother did not testify as to the number of hours she worked. Mother has not presented evidence of a significant disparity in income that would justify shifting the payment of attorney fees from Father to Mother. Additionally, there was no evidence of savings or other assets the parties may have available to them, or if any exist at all. We also note that Father's 2013 contempt petition asserting Mother had failed to pay him attorney fees, a judgment, and child support owed under the original dissolution decree was never ruled upon nor mentioned by the trial court. This would be a relevant consideration in assessing the parties' respective situations. Given the lack of any evidence of a significant economic

disparity between the parties or that the trial court considered the parties' respective economic resources, we conclude it was an abuse of discretion to require Father to pay $7,500.00 towards Mother's attorney fees. *See id.* (reversing award of attorney fees under Section 31-17-7-1 where there was no indication trial court considered parties' resources, economic condition, and other factors bearing on the reasonableness of the award). Furthermore, as for Father's alleged misconduct related to parenting time interference, the evidence presented by Mother does not differentiate between fees related to such alleged misconduct and fees generally related to her motion to modify custody. We decline to affirm the award of fees on this basis. *See J.M. v. N.M.*, 844 N.E.2d 590, 604 (Ind. Ct. App. 2006) (affirming award of attorney fees related to misconduct where the award was "limited to those fees incurred by Mother based on specific unreasonable actions by Father that caused Mother 'additional litigation expenses'"), *trans. denied*.

## Conclusion

[37] The trial court clearly erred in granting Mother's petition to modify custody, as there was insufficient evidence of a substantial change in circumstances justifying modification or that modification was in A.M.'s best interests. We reverse the modification of custody and remand for primary physical custody and sole legal custody of A.M. to be returned to Father, with parenting time for

Mother in accordance with the Indiana Parenting Time Guidelines.[8] Additionally, the trial court abused its discretion in awarding attorney fees to Mother, and we reverse that award as well.

Reversed and remanded.

Vaidik, C.J., and Mathias, J., concur.

---

[8] We remind the parties and trial court that no action should be taken in reliance on this opinion until it is certified as final under Indiana Appellate Rule 65(E).