## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 30 2017, 10:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Andrea L. Ciobanu
Ciobanu Law, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Katherine A. Harmon
Jared S. Sunday
Mallor Grodner, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Kyle Andrews,

*Appellant-Petiitoner,*

v.

Gilliam Moorman,

*Appellee-Respondent.*

May 30, 2017

Court of Appeals Case No.
27A02-1610-JP-2311

Appeal from the Grant Circuit Court

The Honorable Mark E. Spitzer. Judge

Trial Court Cause No.
27C01-1208-JP-431

**Barnes, Judge.**

# Case Summary

Kyle Andrews ("Father") appeals the trial court's modification of custody of his child, T.A., in favor of Gillian Moorman ("Mother"). We affirm.

# Issues

The issues before us are:

    I.      whether the trial judge erroneously failed to recuse himself due to a possible appearance of impropriety;

    II.     whether the modification of custody is supported by sufficient evidence; and

    III.    whether the trial court erred in calculating Father's child support obligation.

# Facts

T.A. was born in July 2011. The parties apparently lived together but had an acrimonious split sometime after T.A. was born. On November 1, 2013, as part of a paternity action filed by Father, the trial court approved the parties' agreement to have joint legal and physical custody of T.A.[1] The parties' relationship was such that they both occasionally cursed and called each other names in front of T.A.; Mother sometimes called Father an "a**hole," and

---

[1] The precise details of this agreement are not in the record before us, because any records in the case prior to July 1, 2014, have been sealed and are not included in the chronological case summary and are not located in the Odyssey case management system. *See* Ind. Admin. Rule 9(G)(2)(k).

Father sometimes called Mother a "piece of s*** and horrible mother." Tr. pp. 433, 457.

[4] Both parties also have had varying degrees of mental health issues related to stress and anxiety. Father has not been working steadily and has been receiving Social Security disability payments for over a decade related to a panic attack in 2002; he claims not to have suffered one since. He received counseling for several years and is on anti-anxiety medication. Much of Father's counseling focused on stress related to co-parenting with Mother. Father often brought T.A. to these appointments, without Mother's approval, although the counselor did not believe it was inappropriate for Father to do so.

[5] Mother also has had panic attacks in the past. She has not undergone counseling for them but did begin taking an anti-anxiety medication in August 2016 as needed. Mother has consistently worked at the pediatric dental practice of her step-father's mother, Dr. Alice Butterworth, for twelve years. She is currently a dental assistant whom Dr. Butterworth praised for her ability to get along with children. Mother also had some physical health issues beginning in approximately December 2015 and culminating with a surgery in August 2016 that appears to have corrected the issues. These issues interfered occasionally with Mother's parenting during this time frame.

[6] One of the primary areas of dispute between the parties has been T.A.'s education. Generally, Mother believes T.A. needs more of it in a formal setting while Father does not. In January 2014, a dispute between the parties with

respect to whether T.A. should attend preschool led to a court order requiring T.A. to attend preschool at Westminster Presbyterian Preschool ("Westminster") in Marion two half-days per week, per Mother's request. Father failed to take T.A. to Westminster on the first day he had to do so, which led to a contempt filing and hearing. Father apparently has consistently taken T.A. to preschool thereafter.

[7] Mother believed T.A. needed to be increasing the amount of time she was in preschool, but Father refused to consent to anything more than two half-days per week. At the end of the school year in spring 2016, T.A.'s preschool teacher assessed her academically, as well as socially and emotionally, and recommended that T.A. was not ready for kindergarten, although she was near the cut-off age to begin attending. T.A. was the only student who attended Westminster for only two half-days per week; all of her classmates attended five days per week, either half or full days. The teacher believed T.A. would have benefitted from more preschool attendance. She also noted that Mother would discuss T.A.'s progress with her when seeing Mother at pick-ups or drop-offs, while Father never did so. Additionally, T.A.'s demeanor and class participation was stable on days that Mother was expected to pick her up from school, but was highly unstable on days that Father was expected to pick her up. After the teacher's recommendation that T.A. was not ready for kindergarten in fall 2016, the parties agreed not to enroll her in kindergarten. Father wanted to move T.A. into a different preschool and to continue her enrollment of two half-days per week while Mother wanted to continue her

enrollment at Westminster and increase her amount of attendance. There was evidence Father sometimes did not respond to Mother's texts wanting to discuss T.A.'s education. Also, Father refused Mother's suggestion that T.A. be enrolled in extracurricular dance classes.

[8] Custody exchanges from Father to Mother often caused T.A. to cry and become highly emotional. Father and T.A. would repeatedly tell each other that they loved one another and would miss each other. Exchanges from Mother to Father were not accompanied by similar outbursts or comments.

[9] Mother has another child, P.T., who is about two years younger than T.A. T.A. and P.T. have a close older sister-younger brother relationship, and both attend Westminster. P.T.'s father, Zachary Thieken, is on good terms with Mother, and they communicate effectively regarding P.T.'s care and education, although they no longer have a romantic relationship. T.A. also is close to Thieken's parents and considers them her grandparents as well; Thieken likewise is close to T.A.

[10] On April 24, 2015, Father filed a petition to modify custody, requesting that he be granted sole legal and primary physical custody of T.A. The trial court appointed a guardian ad litem ("GAL") to evaluate the custody situation, at Father's request. The GAL spoke with Mother, Father, T.A., Thieken, Mother's father, Father's mother, Father's counselor, and Father's psychologist. On December 7, 2015, the GAL filed her report with the trial court. The report ultimately concluded, "I think Mr. Andrews has a good support system and has

taken the proper steps to care for his own mental health issues and is in a better position to provide for the care and custody of [T.A.]. Therefore I recommend father Kyle Andrews be awarded sole legal and physical custody of [T.A.]." Ex. 5 p. 9. The GAL did not file any supplements to this report.

[11] The trial court held a two-day hearing on August 29-30, 2016. Father called as witnesses his counselor, mother, stepfather, Mother's brother Thomas, and himself; Mother called Dr. Butterworth, Thieken, T.A.'s preschool teacher, her mother and father, and herself. By all accounts, T.A. is a sweet, intelligent, well-mannered, and well-adjusted child. The only area of concern appears to be that T.A. is behind other children her age with respect to academics, as well as socially and emotionally. There also was ample evidence that both parents love and care for T.A. and have appropriate homes for her in Marion, and both Mother and Father have extended family with whom T.A. enjoys spending time. There was evidence presented of the parties having different parenting styles, with Mother's being more structured and Father's less so. As may be expected, Father's witnesses believed he was a great parent, and Mother's witnesses believed she was a great parent. Father and some of his witnesses attempted to portray T.A. as being frightened of Mother, which was refuted by Mother's witnesses. Mother's father expressed concern that Father's approach to co-parenting was his "way or no way." Tr. p. 359.

[12] Caught in the middle of this situation was Mother's brother Thomas. He has attempted to remain on friendly terms with Father and had recently attended a birthday party for T.A. hosted by Father's family. At one time, Thomas

expressed concern to Father over a man Mother apparently was dating who had an extensive criminal history. Mother testified that she did see this man for a few months in early 2015 and that he had some interaction with T.A., but that she ceased all communication with him after learning of his criminal history. Thomas also confirmed that he had sent some texts to Father relating, for example, that T.A. appeared happy with Father or that she was afraid of Mother. However, Thomas testified that some of his texts had been misconstrued, particularly during the time of Mother's physical illness, or that Father had misled him about certain matters. In the end, Thomas stated that he had no concerns about either Father or Mother as a parent and that he has observed much more of Mother's parenting than Father's.

[13] The GAL testified that she had not changed her opinion regarding T.A.'s custody since her initial report. T.A.'s teacher testified that she had attempted to call the GAL more than once to speak with her about the case but the GAL failed to return her calls. Mother also testified that the GAL never spoke with her mother or step-father despite her request that she do so, nor did the GAL ever observe Mother and T.A. together. Mother also testified that she would like to be awarded sole legal and primary physical custody of T.A. due largely to the communication issues between her and Father.

[14] Approximately halfway through the second day's hearing, the trial court informed the parties:

> COURT: So unfortunately this happens sometimes, and so I realized um, at the end of the day yesterday that I represented, I

didn't make the connection, I represented Butterworth Industries at some point in the past when I was in private practice…

[Father's attorney]: Okay.

COURT: . . . as a business lawyer.

[Mother's attorney]: Okay.

COURT: So um, I've been on the bench for close to ten years at this point.  It was, and I hadn't done any work for them for a significant time before I had done that, but I realized, I was walking out, and Frank [Mother's step-father] and Suzan [Mother's mother] said hi to me.

[Father's attorney]: Okay.

[Mother's attorney]: Sure.

COURT: I think she would've been a very young kid when I first met them, so I don't know that I've ever met any of their children or anything.  Um, I saw Suzan in March a couple of months ago and said hi to her, and that's probably the first time that I had seen either of them in probably fifteen years maybe, um, but I wanted to disclose that.

[Mother's attorney]: Sure.

[Father's attorney]: Okay.

COURT: I don't know that it's going to make any type of a um, impact on any decision that I would make.  Um, from my perspective this is a choice between two good parents I think is

what, the way I would characterize it, and that can't get along very well together, so um, you know I'd prefer not to have to make the choice at all, and that, you know I want to bring them in and say get along. You know it's what I want to do, but so, but I wanted to disclose that. I know when you get halfway into a custody hearing and like oh great you know, but I felt like you know, when those types of things come up then I do disclose those, and let you know, and then you can take any action or none if you wish to, but I wanted to at least um, do that, and I'd be happy to answer any questions that you might have sort of about the extent of ...

[Father's attorney]: Judge as long as your [sic] confident that your representation of that business fifteen plus years ago wasn't going to uh, one way sway you or the other, then I'm perfectly fine.

COURT: Alright yeah.

[Father's attorney]: I'm absolutely fine with that.

COURT: Yeah. Yeah. I don't believe it would.

[Father's attorney]: Okay.

Tr. pp. 346-48.

[15] On September 28, 2016, the trial court entered an order granting Mother sole legal and primary physical custody of T.A., with Father having parenting time according to the Parenting Time Guidelines. The trial court noted the unfortunate "personal animosity" between the parties but that "both parents are

generally good parents, love their daughter and have her best interest at heart . . . ." Appellant's App. Vol. II p. 36. The trial court further stated:

> In considering the evidence, the Court is mindful that "[e]ven two parents who are exceptional on an individual basis when it comes to raising their children should not be granted, or allowed to maintain, joint legal custody over the children if it has been demonstrated . . . that those parents cannot work and communicate together to raise the children." *Carmichael v. Siegel*, 754 N.E.2d 619, 636 (Ind. Ct. App. 2001). Unfortunately, "a joint custody order may simply provide a framework for the parents to continue the conflict which brought them to divorce in the first place. The conflict would just be focused solely on the children." Barteau and Hopkins, *Joint Custody in Indiana*, 27 Res Gestae 320, 324 (1984). In this case, to continue the joint custody situation with regard to [T.A.][2] would constitute "an intolerable situation upon two persons who have made child rearing a battleground." *Aylward v. Aylward*, 592 N.E.2d 1247, 1252 (Ind. Ct. App. 1992). Thus, under the circumstances, after carefully weighing all of the evidence and assessing the credibility of the witnesses, the Court finds that a sole custody order with Mother as the custodial parent is in [T.A.]'s best interests.

*Id.* at 37.

[16] The trial court also recalculated child support but found Father personally owned none because the amount of Social Security payments he received exceeded his support obligation and the excess was a gratuity. It noted that Father currently is the representative payee for T.A.'s Social Security disability

---

[2] The trial court here mistakenly referred to T.A. by the middle name of her half-brother P.T.

payments that are derivative of Father's own benefits and ordered, "[t]he parties shall take such action necessary to change the representative payee for [T.A.]'s benefits from Father to Mother." *Id.* at 38. On the child support worksheet the trial court granted Father parenting time credit for 96-100 overnights.

[17] On October 7, 2016, Father filed a notice of appeal. On that same date, Father filed with the trial court a "Motion to Enforce Mid-Week Overnight Parenting Time," which also sought to hold Mother in contempt for not allowing such parenting time, as well as a motion for a partial stay of the trial court's order pending appeal. Appellee's App. Vol. II p. 2.[3] On October 19, 2016, the completion of the clerk's record for this case was noted in the trial court's chronological case summary. On November 1, 2016, after holding a hearing on the matter, the trial court denied all of Father's motions. The trial court noted in part that it lacked jurisdiction to alter its September 28, 2016 order because the clerk's record had already been completed for this appeal, but that it was not inclined to alter its order in any case. Father did not renew his motion to stay before this court.

---

[3] Father has filed a motion to strike Mother's appendix, which contains the post-trial motions and orders. We have denied this motion by separate order. Although not significantly impacting our analysis of the case, we believe we may properly take judicial notice of these motions and orders as court records under Indiana Evidence Rule 201(a)(2)(C) and 201(b)(5).

# Analysis

## *I.  Recusal*

The first issue we address is whether the trial judge erred in failing to sua sponte recuse himself after realizing he had previously performed legal work, apparently for a business owned by Mother's mother and step-father, over a decade earlier while in private practice.  Indiana Code of Judicial Conduct 2.11(A) provides, "A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned . . . ."  Comment 5 to this rule states, "A judge should disclose on the record information that the judge believes the parties or their lawyers might reasonably consider relevant to a possible motion for disqualification, even if the judge believes there is no basis for disqualification."  That is precisely what the judge here did, and Father's attorney expressly said she was "absolutely fine" with the judge continuing to preside over this case.  Tr. p. 348.

"A party may not lie in wait and only raise the recusal issue after receiving an adverse decision."  *Carr v. State*, 799 N.E.2d 1096, 1098 (Ind. Ct. App. 2003).  "Waiver notwithstanding, the law presumes that a judge is unbiased in the matters that come before him."  *Id.*  A judge's prior representation of a party in an unrelated case does not mandate the reversal of a judgment, absent a showing of actual prejudice.  *See id.*  Father fails to direct us to any evidence of prejudice based on the judge's representation of a business owned by Mother's step-father and mother over a decade prior to the hearing in this case.  Moreover, although Father concedes that he did not request the judge's recusal,

he suggests that it was unfair to place him in the situation of asking the judge to recuse himself halfway through the second day of hearings in this matter. However, it clearly would have been much preferable to do so then and not now, on appeal and months after the hearing and the order modifying custody. There was no error in the judge declining to sua sponte disqualify himself from consideration of this case.

## II. Modification of Custody

[20] We now address the substance of the trial court's decision to modify legal and physical custody of T.A. in favor of Mother.[4] The trial court here issued some limited, sua sponte factual findings and legal conclusions as part of its order modifying custody. "In such a case, the specific findings control only with respect to issues they cover, and a general judgment standard applies to issues outside the findings." *Montgomery v. Montgomery*, 59 N.E.3d 343, 349 (Ind. Ct. App. 2016), *trans. denied*. We will set aside the trial court's findings or judgment only if they are clearly erroneous. *Id.* "A finding is clearly erroneous only if there are no facts or inferences drawn therefrom to support it." *Id.* Additionally, "[w]e may affirm a general judgment with sua sponte findings upon any legal theory supported by the evidence introduced at trial." *Stone v. Stone*, 991 N.E.2d 992, 998 (Ind. Ct. App. 2013). Sua sponte findings control as to the issues upon which the court has found, but they do not otherwise affect

---

[4] Father suggests the trial court's order is ambiguous. We believe it clearly awarded Mother sole legal custody and primary physical custody of T.A.

our general judgment standard of review, "and we may look both to other findings and beyond the findings to the evidence of record to determine if the result is against the facts and circumstances before the court." *Id.*

[21] We grant "'latitude and deference to our trial judges in family law matters.'" *Steele–Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016) (quoting *In re Marriage of Richardson*, 622 N.E.2d 178 (Ind. 1993)). "Appellate courts 'are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence.'" *Id.* (quoting *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002)). "In order to reverse a trial court's ruling, it is not enough that the evidence might have supported a different conclusion." *Montgomery*, 59 N.E.3d at 350. Rather, the evidence must positively require the conclusion contended for by appellant before we may reverse. *Id.* We may not reweigh the evidence or reassess witness credibility, and must view the evidence in a light most favorable to the judgment. *Id.* Although we must be highly deferential to trial courts in custody cases, that deference is not absolute and reversal is possible. *Id.*

[22] Pursuant to Indiana Code Section 31-14-3-6, a trial court in a paternity proceeding may not modify a physical child custody order unless a noncustodial parent shows both that modification is in the best interests of the child, and there has been a substantial change in one or more of the factors listed under Indiana Code Section 31-14-13-2. Those factors are:

(1) The age and sex of the child.

(2) The wishes of the child's parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

   (A) the child's parents;

   (B) the child's sibling; and

   (C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's home, school, and community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 2.5(b) of this chapter.

[23]   "A parent seeking modification of custody bears the burden of proving that the existing custody order should be altered." *Montgomery*, 59 N.E.3d at 350. "Indeed, this 'more stringent standard' is required to support a change in

custody, as opposed to an initial custody determination where there is no presumption for either parent because 'permanence and stability are considered best for the welfare and happiness of the child.'" *Steele-Giri*, 51 N.E.3d at 124 (quoting *Lamb v. Wenning*, 600 N.E.2d 96, 98 (Ind. 1992)).

[24] With respect to modification of legal custody, a trial court should specifically consider whether there has also been a change in one of the statutory factors governing awards of joint legal custody. *Julie C. v. Andrew C.*, 924 N.E.2d 1249, 1259-60 (Ind. Ct. App. 2010). In a paternity case, those factors are:

> (1) the fitness and suitability of each of the persons awarded joint legal custody;
>
> (2) whether the persons awarded joint legal custody are willing and able to communicate and cooperate in advancing the child's welfare;
>
> (3) the wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age;
>
> (4) whether the child has established a close and beneficial relationship with both of the persons awarded joint legal custody;
>
> (5) whether the persons awarded joint legal custody:
>
>> (A) live in close proximity to each other; and
>>
>> (B) plan to continue to do so;

(6) the nature of the physical and emotional environment in the home of each of the persons awarded joint legal custody; and

(7) whether there is a pattern of domestic or family violence.

I.C. § 31-14-13-2.3(c).

[25] Father argues in part that we must reverse and remand because the trial court failed to enter specific findings indicating that it had considered the statutory factors for a modification of custody or that its order lacked sufficient indication that it had adequately considered those factors, citing primarily *Green v. Green*, 843 N.E.2d 23 (Ind. Ct. App. 2006). In that case, this court reversed and remanded a modification of custody because the trial court did not enter any findings demonstrating it had considered the relevant statutory factors for a modification of custody. However, we believe our supreme court subsequently has indicated such findings are not necessary if no findings are requested. In *Baxendale v. Raich*, 878 N.E.2d 1252 (Ind. 2008), the trial court failed to enter any findings when modifying custody, and none were requested. Our supreme court noted the general standard of review that a judgment will be affirmed "'if sustainable upon any theory consistent with the evidence.'" *Baxendale*, 878 N.E.2d at 1257 (quoting *Perdue Farms, Inc. v. Pryor*, 683 N.E.2d 239, 240 (Ind. 1997)). The court proceeded to affirm the custody modification based on the evidence in the record supporting it and made no mention of the trial court's lack of findings as being problematic. *Id.* at 1257-58.

[26] Here, the trial court's sua sponte partial explanation of its order modifying custody did not obligate it to enter complete findings on all of the statutory modification factors. Rather, our standard of review is that we may affirm the trial court based on any evidence in the record. *See id.*; *Stone*, 991 N.E.2d at 998. The trial court's failure to make more detailed findings, in the absence of a request for such findings, is not an indication that it did not carefully consider the evidence and correctly apply it to the law.

[27] Similarly, Father contends the trial court's reference in its order to this court's decision in *Aylward v. Aylward*, 592 N.E.2d 1247 (Ind. Ct. App. 1992), is fatal. In that case, we reversed an award of joint legal custody because it imposed "an intolerable situation upon two persons who have made child rearing a battleground." *Aylward*, 592 N.E.2d at 1252. Father asserts the trial court erred in relying on *Aylward* in a case that presented issues of both legal and physical custody. He notes that, in *Van Wieren v. Van Wieren*, 858 N.E.2d 216 (Ind. Ct. App. 2006), this court rejected a parent's attempt to rely upon *Aylward* in addressing a joint physical custody issue. We said that, although modification of joint legal custody may be a "sensible step" to take if parents have made child-rearing a battleground, "[i]t does not necessarily follow . . . that the same result must be reached with respect to a split physical custody arrangement." *Van Wieren*, 858 N.E.2d at 222. However, as with the trial court's findings (or lack thereof) regarding custody, the trial court's legal conclusions regarding custody did not have to be thorough and complete. Although it did not distinguish between legal and physical custody when citing *Aylward*, there was

nothing wrong with it having mentioned the case, and we will proceed to review whether there was sufficient evidence to support a modification of both physical and legal custody when applying the correct legal standard.

[28] The next issue we address is whether there is sufficient evidence of a substantial change in circumstances of one of the statutory custody factors. Father contends that, by modifying custody, the trial court essentially punished him for his and Mother's lack of cooperation in caring for T.A., or conversely that it rewarded Mother for her poor behavior. He cites *Van Wieren*, in which this court affirmed a trial court's denial of the father's motion to modify custody. The parties had an acrimonious relationship and a split physical custody arrangement, and this court stated, "[i]f the trial court had awarded sole physical custody to either party, the 'winner' would have been well rewarded for obstreperous, disrespectful, and distasteful behavior." *Van Wieren*, 858 N.E.2d at 222.

[29] However, this statement in a case affirming a denial of modification does not require a trial court to deny a physical custody modification request in all cases where the parents have joint legal and physical custody and an acrimonious relationship. The facts and circumstances of each case are unique. In fact, one of the statutory physical custody factors that may change over time is "[t]he wishes of the child's parents." I.C. § 31-14-13-2(2). One of the legal custody factors is "whether the persons awarded joint legal custody are willing and able to communicate and cooperate in advancing the child's welfare." I.C. § 31-14-13-2.3(c)(2). Here, neither parents believed the joint legal and physical custody

situation to which they had previously agreed was sustainable as it was causing too much stress to both of them and T.A. Father himself was the one who originally moved to modify custody, and he testified that having joint custody was "overwhelming challenging." Tr. p. 180. "[J]oint custody is difficult when the parents are able to communicate effectively and almost always detrimental to the wellbeing of the child when they cannot. . . . There are times when a breakdown of communication between parents renders joint custody no longer in the best interests of the child." *In re Paternity of A.S.*, 948 N.E.2d 380, 387 (Ind. Ct. App. 2011) (affirming modification of physical custody where both parents requested modification).

[30] Furthermore, Father arguably is judicially estopped from now asserting that a modification of custody was unwarranted. "Under the doctrine of judicial estoppel, a party may not assert a position in a legal proceeding inconsistent with one previously asserted." *Hay v. Baumgartner*, 903 N.E.2d 1044, 1049 (Ind. Ct. App. 2009), *trans. denied*. This doctrine prohibits a party from repudiating assertions in the party's own pleadings. *Plaza Group Properties, LLC v. Spencer County Plan Comm'n*, 911 N.E.2d 1264, 1269 (Ind. Ct. App. 2009), *trans. denied*. Father clearly pled, presented evidence on, and argued that joint legal and physical custody between the parties was no longer feasible. It is inconsistent for him to now claim differently. Rather, Father's real, viable complaint now is not so much that the trial court modified custody, but that it modified it in favor of Mother. We now proceed to analyze the evidence on that point.

[31] Father and Mother present vastly different characterizations of the evidence. Suffice it to say, there was ample evidence that Father and Mother do not get along, that each has had some mental health troubles, and that they are incapable of co-parenting effectively but are loving and caring parents to T.A. individually and have extended family who care for her too. As for which parent would be "better" for T.A. to have primary physical and sole legal custody of her, the trial court heard two days of testimony from eleven witnesses, nearly evenly divided between those supporting Father and those supporting Mother. The trial court had the unenviable Solomonic task, as is often this case in these situations, of making a decision about T.A.'s custody in light of conflicting evidence. It heard the witnesses firsthand, observed their demeanors, and decided the better fit for T.A. was with Mother. Under the facts and circumstances of this case, we cannot second-guess that decision.

[32] We note the following evidence that could have tipped the scales in favor of Mother having primary physical and legal custody as being in T.A.'s best interests. First, there was evidence that Father's approach to educating T.A. was vastly different and more lackadaisical from Mother's and that Mother's desire for more schooling for T.A. would be in her best interests. Second, T.A. has a closely-bonded relationship with her half-brother P.T., and she would benefit from spending more, not less, time with him by Mother having primary physical custody of T.A. Third, with respect to P.T., his father testified strongly in support of Mother and her parenting skills and explained that they get along well with respect to co-parenting. This would tend to support Mother and her

other witnesses' testimony that co-parenting issues with respect to T.A. derive more from Father than Mother. Father attempts to direct us to evidence painting him as the better custodian for T.A., but that evidence largely was contradicted, such as of T.A. being frightened of Mother or of Mother knowingly having a romantic relationship with an habitual criminal. To consider Father's evidence would require us to reweigh the evidence, which we cannot do.

[33] We acknowledge the GAL recommended that Father be granted primary custody of T.A. Trial courts are not required to accept the opinions of experts regarding custody, however. *Clark v. Madden*, 725 N.E.2d 100, 109 (Ind. Ct. App. 2000). The trial court heard from more persons than the GAL did regarding custody, with the added benefit of those persons being subjected to adversarial testing. It was entitled to draw its own conclusions regarding what would be in T.A.'s best interests, contrary to the GAL's conclusion.

[34] As noted, it is not impossible to reverse a trial court's decision regarding child custody on appeal. Given our deferential standard of review, however, it is relatively rare. By way of comparison, we recently reversed a custody modification order in *Montgomery*. The trial court modified primary custody from the father to mother, who was living out of state, based largely on father's alleged interference with mother's parenting time. We reversed because there was uncontradicted evidence of the child's positive living situation with father, a lack of evidence of mother's current out-of-state living situation, and a lack of evidence that the father's limited interference with the mother's parenting time

had substantially or continually impacted the child's relationship with the mother or affected the child's mental or physical health. *Montgomery*, 59 N.E.3d at 353. Here, by contrast, the parties agreed that a change from joint custody was needed, there was ample evidence of Mother's stable and positive living situation and ability to lovingly care for T.A., and the change of custody would not necessitate a change in T.A.'s locale or interaction with extended family and friends. The facts of this case do not present us with sufficient reason to second-guess the trial court's decision to modify physical and legal custody in favor of Mother.

### III. Child Support

### A. Parenting Time Overnights

[35]     Father's first argument regarding the trial court's child support order is really an attack on its parenting time order. Specifically, Father contends the trial court should have given him a midweek overnight visit with T.A., which would increase the child support credit for overnights to which he would be entitled. Indiana Child Support Guideline 6 provides, "A credit should be awarded for the number of overnights each year that the child(ren) spend with the noncustodial parent." The commentary to this Guideline states in part, "If the parents are using the Parenting Time Guidelines without extending the weeknight period into an overnight, the noncustodial parent will be exercising approximately 96-100 overnights." The trial court here awarded Father parenting time in accordance with the standard Indiana Parenting Time Guidelines for a child three years and older: alternating weekends, one evening

per week (not an overnight), and all scheduled holidays.  Ind. Parenting Time Guideline (II)(D)(1).  It also awarded Father a child support credit for 96-100 overnights.

[36]    We review a trial court's parenting time decision for an abuse of discretion. *Perkinson v. Perkinson*, 989 N.E.2d 758, 761 (Ind. 2013).  "We will not substitute our own judgment if any evidence or legitimate inferences support the trial court's judgment."  *Baxendale*, 878 N.E.2d at 1257–58.  Additionally, "[t]here is a presumption that the Indiana Parenting Time Guidelines are applicable in all cases."  Parenting Time G. Scope of Application (C)(3).[5]

[37]    Father never requested during the modification hearing that he be allowed midweek overnight parenting time with T.A., which would be a deviation from the standard and presumptively-adequate parenting time he was entitled to under the Parenting Time Guidelines.  A party generally cannot present an argument or issue on appeal that was not presented to the trial court.  *Thomson Inc. v. Insurance Co. of North America*, 11 N.E.3d 982, 1015-16 (Ind. Ct. App. 2014).  The first time Father mentioned the possibility of midweek overnight parenting time was in his post-trial motion to "enforce" it, which reflected a mistaken belief that he was entitled to such visitation without ever requesting it.  Appellee's App. Vol. II p. 2.  The trial court correctly refrained from reconsidering its parenting time order, in light of this court having already

---

[5] A trial court also must provide a written explanation if it decides to deviate downward from the Parenting Time Guidelines, but not if it awards more than the minimum recommended parenting time.

acquired jurisdiction under Indiana Appellate Rule 8 after the notice of completion of clerk's record was noted in the chronological case summary. *See Crider v. Crider*, 15 N.E.3d 1042, 1064-65 (Ind. Ct. App. 2014). In sum, Father cannot establish that the trial court abused its discretion in not awarding him midweek overnight parenting time where he did not request it during the modification hearing.[6]

### B. Social Security Payments

[38] The final issue Father raises is that the trial court erred in ordering the parties to "take such action necessary to change the representative payee for [T.A.'s derivative Social Security disability] benefits from Father to Mother." Appellant's App. Vol. II p. 38. He directs us to 42 U.S.C. § 407(a), which states:

> The right of any person to any future payment under this subchapter [regarding Social Security payments] shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.

He also notes that the Social Security Administration ("SSA") has been tasked with designating representative payees for benefit payments under 42 U.S.C. §

---

[6] Father, of course, was hoping to be awarded primary custody of T.A. himself, but a request for additional parenting time in the alternative, should the trial court award primary custody to Mother, could have been made at the modification hearing.

405(j) and 20 C.F.R. §§ 404.2001-404.2065. *See also Brevard v. Brevard*, 328 S.E.2d 789, 792 (N.C. Ct. App. 1985) (holding that state courts lack the power to direct the SSA to pay a child's benefits to anyone other than the designated representative payee).

[39] Be that as it may, the trial court did not purport to order the SSA to do anything or to order any sort of legal process against T.A.'s derivative benefits. Rather, its order was directed solely to the parties and required them to take the necessary steps with the SSA t`o change the representative payee designation, with the ultimate decision of whether to make the change being left to the SSA's discretion. So long as Father cooperated with Mother in seeking the change, they would have fulfilled the trial court order's mandate. We see no impropriety in the trial court's order regarding T.A.'s derivative Social Security benefits.

## Conclusion

[40] The trial judge did not err in failing to sua sponte recuse himself from consideration of this case. There is sufficient evidence to support the modification of custody in favor of Mother, and there is no error in the child support or parenting time orders. We affirm.

[41] Affirmed.

Baker, J., and Crone, J., concur.