## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 28 2017, 9:19 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Shannon L. Robinson
Shannon Robinson Law, P.C.
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Seth M. Lahn
Indiana University Maurer School of Law
Bloomington, Indiana

Kelsie Breit
Justin Mei
Certified Legal Interns
Indiana University Maurer School of Law
Bloomington, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

T.S.,

*Appellant-Respondent,*

v.

D.S.,

*Appellee-Petitioner.*

April 28, 2017

Court of Appeals Case No.
53A01-1608-PO-1817

Appeal from the
Monroe Circuit Court

The Honorable
Valeri Haughton, Judge

Trial Court Cause No.
53C08-1606-PO-1129

**Kirsch, Judge.**

[1] T.S. ("Husband") appeals the trial court's issuance of an order for protection ("Protection Order") against him and in favor of D.S. ("Wife"). Husband raises the following issue for our review: whether there was sufficient evidence to support the issuance of the Protection Order.

[2] We affirm.

## Facts and Procedural History

[3] Husband and Wife are the married parents of an infant son, A.S. Wife also has two older children of whom Husband is not the father. On November 15, 2015, Sergeant Jeff Finer ("Sergeant Finer") of the Monroe County Sheriff's Department responded to a call at the parties' home. There, Sergeant Finer found Husband intoxicated, belligerent, and walking around carrying A.S., who at that time was less than two months old. Sergeant Finer was concerned for A.S.'s safety and determined that removing A.S. from Husband's arms was in the baby's best interest. *Tr.* at 29. Husband, however, ignored Sergeant Finer's request to put the baby down, and instead, he continued to walk around the residence with A.S. in his arms. Wife explained to Sergeant Finer that Husband had struck A.S.'s head on a doorframe while carrying the baby out of the bedroom. As a precaution, and "as a way to get [Husband] to relinquish the child and have it checked by medical professionals," Sergeant Finer called emergency medical services ("EMS"). *Id.* at 30.

[4] EMS personnel responded, and Husband "hovered over" them while they examined A.S. *Id.* at 31. Once EMS workers completed their examination,

finding A.S. uninjured, Husband "snatched the baby back up off the couch . . . before [Sergeant Finer or] EMS were able to take possession of the child." *Id*. Sergeant Finer arrested Husband and charged him with neglect of a dependent and resisting law enforcement.

[5]     In April 2016, Husband filed a petition for dissolution of the parties' marriage, which remained pending throughout the proceedings in the instant case. *Appellant's Br*. at 6. Around the same time, Wife filed her first petition for an order of protection against Husband. The Monroe Circuit Court issued an Ex Parte Order of Protection which it later vacated.

[6]     On June 1, 2016, Wife filed another petition ("Petition") for civil order for protection alleging that Husband was placing her "in fear of physical harm and that he [had] been stalking [her]." *Tr*. at 15. She also set forth the incidents that prompted her to file the Petition. *Id*.

[7]     On July 20, 2016, the trial court held a hearing on the Petition, at which Husband and Wife acted pro se. Wife testified that the first time the parties met to exchange visitation of A.S. under the interim orders in the dissolution case, Husband said nothing to Wife. Instead, he stood behind her taking pictures, which Wife testified, "place[d her] in fear of physical harm, because of his size." *Id.* Wife also testified to an occasion when Husband appeared at daycare as Wife arrived to pick up A.S. Husband followed Wife around, videotaping her and asking, "Why are you keeping me from my son?" *Id.* at 16. Husband's behavior during that incident sufficiently alarmed A.S.'s daycare

provider and prompted her to move the children under her care to a back room of the building. *Id.* at 17. The following day, when Wife arrived at work, she found an instant message on her computer from Husband stating "giddy- up"—a phrase that he typically used to threaten consequences, indicating "game on." *Id.*

[8] Husband admitted that he videotaped Wife on more than one occasion, including their exchanges for visitation at the Ellettsville Police Department or the Woodbridge Bloomington Post Office. *Id.* at 49-50. Husband and Wife worked for the same employer, in the same building, and when Wife went outside for breaks at work, Husband would walk outside and stand or sit next to her. *Id.* at 18-19. Wife testified that she was in physical fear of Husband, stating, Husband's "behavior to me is not normal. So then when he stands over [the] top of me, it's like he uses his presence . . . so he physically intimidates me. And then he emotionally and mentally intimidates me also." *Id.* at 19.

[9] Between November 2015 and July 2016, Husband called the Department of Child Services ("DCS") on nine occasions. *Id.* at 14. Husband testified at the hearing that there "were times I was not afforded my visitation, and so my assessment of the possible mental and emotional inflictions that may be occurring to my son [A.S.] in regards to jerking a father in and out of the child's life, [led] me to call DCS and only report on my mental and emotional concerns of that action by [Wife]." *Id.* at 42. Wife testified that: (1) Husband had "threatened to have [Wife's] children taken away"; (2) Husband's statement regarding calling DCS was a threat; and (3) Husband had called the

police on Wife two times, admitting to her that he did so to gain an advantage in family court, specifically related to the custody of A.S. *Id.* at 11,12 and 16.

[10] DCS performed a welfare check on A.S. on May 28, 2016. Family case manager Yunika Jackson ("FCM Jackson") observed, and later testified, that Wife was in fear of Husband. *Id.* at 34. Three days later, DCS convened a child and family team meeting. Wife brought to the meeting two "co-workers and friends" and one family member, all of whom expressed concern for the safety of Wife, A.S., and Wife's other children at the hands of Husband. *Id.* at 34, 36. The DCS team worked out a safety plan to protect Wife and all her children. *Id.* at 34

[11] Husband attempted to intimidate Wife into dropping or altering allegations against him in both the protection order case and the criminal case against him resulting from the confrontation with law enforcement at the couple's home in November 2015. *Id.* at 18, 55, 64. Husband also threatened that if something happened to Wife's teenage son, she would not have control over that situation. *Id.* at 18. Husband suggested he could file a paper with the court to change custody. When Wife suggested that Husband was threatening her, Husband stated, "[N]o, I'm just asking, we can all make mistakes . . . so you remember that." *Id.* Husband wanted Wife to see that "mistakes are made that could lead to things that are uncontrollable." *Id.* at 55-56.

[12] The trial court entered its Protection Order on July 20, 2016. Husband now appeals.

# Discussion and Decision

[13] Husband contends there was insufficient evidence to support the issuance of the Protection Order. When a trial court enters findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A), we apply a two-tiered standard of review: first, we determine whether the evidence supports the findings, and then, we determine whether the findings support the order. *Fox v. Bonam*, 45 N.E.3d 794, 798 (Ind. Ct. App. 2015); *Mysliwy v. Mysliwy*, 953 N.E.2d 1072, 1075-76 (Ind. Ct. App. 2011), *trans. denied*. We do not reweigh evidence or reassess witness credibility, and we consider only the evidence favorable to the trial court's order. *Montgomery v. Montgomery*, 59 N.E.3d 343, 350 (Ind. Ct. App. 2016), *trans. denied*; *Mysliwy*, 953 N.E.2d at 1076. The party appealing the order must establish that the findings are clearly erroneous. *Id*. Findings are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made. *Id*.

[14] Civil orders for protection are governed by the Civil Protection Order Act ("the CPOA"), codified at Indiana Code chapter 34-26-5. "Our legislature has dictated that the CPOA shall be construed to promote the: (1) protection and safety of all victims of domestic or family violence in a fair, prompt, and effective manner; and (2) prevention of future domestic and family violence." *Mysliwy*, 953 N.E.2d at 1076 (citing *Aiken v. Stanley*, 816 N.E.2d 427, 430 (Ind. Ct. App. 2004)). "A person who is or has been a victim of domestic or family violence may file a petition for an order for protection against a: (1) family or household member who commits an act of domestic or family violence; or (2)

person who has committed stalking under IC 35-45-10-5 . . . against the petitioner[.]" *Hanauer v. Hanauer*, 981 N.E.2d 147, 149 (Ind. Ct. App. 2013) (citing Ind. Code § 34-26-5-2(a)).

[15] As relevant here, "Domestic or family violence" is defined as the occurrence of at least one of the following acts by the respondent:

> (1) Attempting to cause, threatening to cause, or causing physical harm to another family or household member.

> (2) Placing a family or household member in fear of physical harm.

> . . . .

Ind. Code § 34-6-2-34.5.

[16] For the purposes of the CPOA, the definition of "domestic or family violence also includes stalking . . . ." *Id*. Stalking is "a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened." Ind. Code § 35-45-10-1. "Harassment" is defined as "conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress." Ind. Code § 35-45-10-2. "Impermissible contact" is contact that

"includes but is not limited to knowingly or intentionally following or pursuing the victim." Ind. Code § 35-45-10-3.

[17] A trial court has discretion over whether to grant an order of protection. *Costello v. Zollman*, 51 N.E.3d 361, 367 (Ind. Ct. App. 2016) (citing *A.N. v. K.G.*, 10 N.E.3d 1270, 1271 (Ind. Ct. App. 2014)), *trans. denied sub nom. L.C. v. W.Z.*, 51 N.E.3d 371 (Ind. 2016). A "protective order may be issued when a trial court finds, by a preponderance of the evidence, that the respondent represents a credible threat to the safety of petitioner—that is, that domestic or family violence [including stalking] has occurred." *Maurer v. Cobb-Maurer*, 994 N.E.2d 753, 756 (Ind. Ct. App. 2013) (citing Ind. Code § 34-26-5-9(f)). Here, the trial court found, "[Wife] has shown, by a preponderance of the evidence, that domestic or family violence or stalking has occurred sufficient to justify the issuance of this Order." *Appellant's App*. at 13.

[18] Husband contends that Wife presented insufficient evidence to support the Protection Order. We disagree.

[19] Wife testified that, during the November 2015 incident, Husband drunkenly and belligerently paced around the home with two-month-old A.S. in his arms and repeatedly refused the instruction of Sergeant Finer to relinquish the baby. *Tr*. at 21, 28. Husband had "smacked" the baby's head while carrying him through a doorway. *Id*. at 28. Sergeant Finer called the EMS and, when they arrived, Husband allowed EMS personnel to determine whether A.S. had sustained any injuries. Once the examination was complete, Husband quickly

grabbed A.S. before anyone else could. Thereafter, Husband did not hand A.S. to Sergeant Finer until the officer threatened to arrest Husband. *Id*. at 31-32.

[20] Around April 2016, after Husband filed a petition for dissolution of the parties' marriage, Husband displayed troubling behavior, including actions such as: (1) shutting off Wife's phone and flattening her tires, when the parties were having a dispute, so that Wife could not leave or summon help; (2) taking photographs of Wife while she slept; and (3) attempting to intimidate Wife into changing her statement to police after Husband was arrested and charged with resisting law enforcement and neglect of a dependent. *Id*. at 13.

[21] Wife testified that, after she filed the Petition in June 2016, Husband threatened her, saying: "you have three days to drop the protection order, to work out a deal, . . . or my fight's on." *Id*. at 18. Husband asked her, "What if something happens with [your] teenage son, that's not in your control?" *Id*. Husband suggested he could file a paper with the court to change custody. When Wife told Husband that his statements sounded like a threat, Husband said, "[N]o, I'm just asking, we can all make mistakes . . . so you remember that." *Id*. By his own admission, Husband gave Wife this ultimatum to make her see that "mistakes are made that could lead to things that are uncontrollable." *Id*. at 55-56.

[22] Husband photographed and videotaped Wife without her permission more than once. *Id*. at 49-50. During those occasions, Husband engaged in no conversation, but only asked Wife why she was keeping A.S. from him. *Id*. at

16. These incidents occurred during parenting time exchanges and when Husband unexpectedly appeared at A.S.'s daycare. *Id.* at 17. Husband's actions seemed threatening enough that the daycare provider moved the children in her care to the back of the daycare. *Id.* at 16-17. Wife also testified that Husband used his physical size to intimidate her. *Id.* at 15.

[23] FCM Jackson testified that Wife's fears and those fears of co-workers, concerning the risk Husband posed to Wife and A.S., were significant enough to warrant a family team meeting. FCM Jackson learned from Wife's co-worker that Husband and Wife worked for the same employer, and Husband would follow Wife outside on breaks, standing or sitting close to Wife. *Id.* at 36. Husband would also park his car next to her car at work. *Id.* At the May 2016 child and family team meeting, FCM Jackson formed a safety plan to protect Wife and A.S. from possible harm by Husband. *Id.*

[24] Considered in the light most favorable to the trial court's order, the record shows that Husband committed multiple harassing acts against Wife, which both frightened her and would cause a reasonable person to feel frightened, especially in the context of the parties' ongoing contentious divorce. The trial judge was in the best position to listen to the testimony of the parties and other witnesses, assess the parties' credibility, intentions, and emotional responses, and determine what would best protect Wife and A.S. Viewed consistently

with our standard of review, the evidence was sufficient to support the trial court's issuance of the Protection Order.[1]

Affirmed.

Robb, J., and Barnes, J., concur.

---

[1] The Protection Order pertains to Wife, A.S., and two other individuals. Husband makes no separate claim as to any individual; instead, he argues that there is insufficient evidence for the Protection Order. Accordingly, we proceed under the assumption that the Protection Order is considered as a whole, and, therefore, we affirm as to all persons named in the Protection Order.